UNITED STATES DISTRICT COURT
For the District of New Jersey

KEVIN PLANKER, RYAN PITTENGER, and fellow     :     Civil No.: 14249

ASATRU BELIEVERS,     :

       Plaintiffs     :

    V.     :

LAWRENCE AKINS, MALACHIA BRANTLEY, WARREN     :

WILCOX, STEPHEN D'LLIO, MARCUS HICKS, VICTOR     :

LEE, MICHELLE RICCI, THE STATE OF NEW JERSEY,     :     Complaint

PHIL MURPHY, UNIVERSITY HEALTHCARE, THE     :

UNITED STATES OF AMERICA, JOHN DOE, JPAY,     :

and JANE DOE,     :

       Defendants     :

    :     Jury Trial Demanded

1. This is a civil-action complaint brought forth on behalf of all Asatru Believers by Kevin Planker, Ryan Pittinger, and additional named plaintiffs. Kevin Planker is currently incarcerated in Northern State Prison, 168 Frontage Road, Newark, NJ 07114, and Ryan Pittinger was released from Northern State Prison in March of 2020. Plaintiff Ryan Pittinger is living at 350-F Shore Rd., Montauge, NJ, 07819, and his mailing address is P.O. Box 151, Newton, NJ 07860

2. Plaintiffs assert jurisdiction pursuant to 42 U.S.C. 1983, the Religious Land Use and Institutionalized Persons Act of 2000, the Religious Freedoms Restoration Act, and pendant or supplemental jurisdiction under the New Jersey Tort Claims Act.

3. Plaintiffs seek preliminary, final, and prospective injunctive relief, Temporary Restraining Orders, punitive damages, compensatory damages, nominal damages, and preliminary and final declaratory judgments as explained in this complaint.

4. Plaintiff Number One is Kevin Planker, who was previously incarcerated at New Jersey State Prison ("NSJP") at First and Case streets, Trenton, NJ 08625 from November of 1999 to April of 2017, after which he was temporarily transferred to Northern State Prison ("NSP") until being transferred to East Jersey State Prison ("EJSP"), Lock Bag R, Rahway, NJ 07065 from January of 2018 until August of 2019, after which he was transferred back to Northern State Prison. Plaintiff Kevin Planker is filing this suit on behalf of himself and nearly a hundred and seventy named members of Asatru and many unnamed members who have recently attempted to practice the religion of Asatru throughout New Jersey's Department of Corrections, on behalf of numerous civilians who have attempted and/or are currently attempting to practice Asatru as civilians in New Jersey and the United States and its territories, on behalf of himself and other people who will be released from institutions in the near future and will attempt to practice Asatru as ex-offenders in New Jersey and the United States and its territories, on behalf of himself and other individuals who will attempt in the near future, have already attempted, and/or are currently attempting to practice Asatru while on probation and parole in New Jersey and the United States and its territories, and on behalf of individuals who will be incarcerated and/or be subjected to the conditions of probation and parole in the future and will be subjected to existing

2

restrictions on the ability to practice Asatru in the near future. Plaintiff Kevin Planker is also filing this suit on behalf of himself and others who have been subjected to disparate treatment, and who have not been given access to religiously acceptable medical treatment, a religious diet and offerings, natural cosmetics and detergents, ritually appropriate food preparations, and religious items, areas, and conditions that are necessary for them to practice their sincerely held beliefs, as stated in this complaint and additional documents. This Plaintiff is also filing suit on behalf of himself and others who have been subjected to religious discrimination by Defendant JPAY's products/services.

5. Plaintiff Number Two is Ryan Pittinger, who was incarcerated in the NJDOC facilities until March 13, 2020, at which time he was released from Northern State Prison. Plaintiff Ryan Pittenger is filing this suit on behalf of himself and nearly a hundred and seventy named members of Asatru and many unnamed members who have recently attempted to practice the religion of Asatru throughout New Jersey's Department of Corrections, on behalf of numerous civilians who have attempted and/or are currently attempting to practice Asatru as civilians in New Jersey and the United States and its territories, on behalf of himself and other people who have been released from institutions and are currently attempting to practice Asatru as ex-offenders in New Jersey and the United States and its territories, on behalf of himself and other individuals who will attempt in the near future, have already attempted, and/or are currently attempting to practice Asatru while on probation and parole in New Jersey and the United States and its territories, and on behalf of individuals who will be incarcerated and/or be subjected to the conditions of probation and parole in the future and will be subjected to existing restrictions on the ability to practice Asatru in the near future. Plaintiff Ryan Pittenger is also filing this suit on behalf

3

of himself and others who have been subjected to disparate treatment, and who have not been given access to religiously acceptable medical treatment, a religious diet and offerings, natural cosmetics and detergents, ritually appropriate food preparations, and religious items, areas, and conditions that are necessary for them to practice their sincerely held beliefs, as stated in this complaint and additional documents.   This Plaintiff is also filing suit on behalf of himself and others who have been subjected to religious discrimination by Defendant JPAY's products/services.

6. The following list consists of only the Named Plaintiffs currently or recently incarcerated within NJDOC (including the unnamed plaintiffs, there are over three hundred Asatru practitioners who have been or are still in the NJDOC within the past two years):

1. PLANKER, KEVIN, 92676bB
2. PITTINGER, RYAN. 584411C
3. LUBIL, LOU, 470721
4. SHEPPARD, AARON
5. ANEVSKI, 568897
6. HESSE, ROB, 1097378
7. ARROYO, 618014
8. LEPTIEN, JOE, 627478
9. ARROYO, ANTHONY, 621072
10. LIMITE. 2000392
11. ATWELL, LUKE, 1170199
12. LUCAS, 877138
13. CASTELLUZZO, CHRIS, 1174062
14. McKINNON, 639833
15. CASSELLA, MIKE, 807699
16. NAYDA, VADIM, 1077800
17. WIERSIG, JUSTIN, 1161720
18. NOLAN, 731331
19. CEDDA, 1177162
20. O'BRIEN, KEVIN, 544179
21. CONWAY, 631655
22. PATRIACO, SAM, 748695
23. CHAPMAN, 1096518
24. WILSON, GARY, 835722
25. CONDIT, 535114

4

26. ACUNA, STEVE, 872218
27. COSTELLO, CHRIS, 1183952
28. RAFFERTY, MIKE, 877799
29. COLE, 836193
30. RAMM, HENRY, 246724
31. CROW, ALEX, 625125
32. RUARK, 690346
33. DANISE, RAPHEALLE, 720900
34. RUCERETO, DANIEL, 456970
35. DEHAVEN, JAMES, 688345
36. SABATINI, KEVIN, 70230
37. DIGISOFFATTE, JOE, 643318
38. SANDFORD, 639272
39. DOUGHERTY, JOE, 474151
40. SMITH, SCOTT, 1005698
41. FEDO, RON, 738531
42. SOUTH, JEREMY, 3000929
43. GENNETT, 1180961
44. SPRAGG, KEVIN, 528703
45. GILMAN, 1150442
46. TERC, 720032
47. TOZER, WILLIAM 226232
48. TITUS, 743897
49. VITELLO, 269806
50. CERESA, 642326
51. SHAVER, ROBERT, 637135
52. MITCHELL, 769491
53. BENTLEY, MICHAEL, 591529
54. FRITZ, BRANDON, 604167
55. BILODEAU, BRANDON, 612196
56. GOUMNOV, ANDREI, 408273
57. RASO, DENNIS, 65267
58. GREEN, MATT, 315187
59. DICK, PHILLIP, 483719
60. HARDY, JEFFREY, 641443
61. THOMSON, DANIEL,
62. HOWE, ANTHONY, 706172
63. DIX, ROBERT, 717211
64. first KELLY, KEVIN (at NSP in 2020)
65. FARRELL, SEAN, 231953
66. BEAGELL, DAVID, 772291E
67. FERRELL, THOMAS, 579951
68. MALTESE, MIKE, 673715
69. NICHOLS, DONALD, 644610
70. MCKEEHAN, BRETT, 877818

71. PAGLIAROLI, DAVID, 239236
72. SULLIVAN, STEVE, 655086
73. POST, JOE
74. TAYLOR, TRACEY, 896958
75. BAKER, JASON, 271063
76. LONGO, SALVATORE, 151601D
77. ANDRETTA, JOHN, 498356C
78. GALLICHIO, JAMES , 739680
79. GENTRY, JACOB,
80. FACKRELL, ANDY, 901672
81. REGISTER, CLIFTON, 1083701
82. PLOPPERT, MATT, 259164B
83. SPERRY, TOM, 584066B
84. TOLDT, VINCENT, 981125B (Released from NSP in October of 2019)
85. CASSELLA, MICHAEL, 807699
86. KREVOLT, MARK, 527576C
87. McCLAREN, NIKLAUS, 101947D
88. FOY, JOSEPH, 610690B
89. HOUSER, BRANDON, 916354C
90. RICCIARDI, RICH, 314189C
91. McPHERSON, JOE, 309713C
92. FINE, KEVIN, 360291D
93 SCOTESE, KYLE, 277682D
94. ALEXANDER, NICK, 1091938
95. SHUGIN, MATT, 939763C
96. LOPEZ, HOWARD, 526507C
97. ANDERSAVAGE, ROB,
98. MYERS, MICHAEL, 1132000
99. LEGGIE, MICHAEL, 1133579
100. TINCHER, SHANE, 611307C
101. HART, 260518
102. HOFFMAN, WILLIAM
103. HARRISON, BENJAMIN, 472259C
104. COLATRELLA, JOE, 337680D
105. HELM, RODGER, 435791
106. JUSTIN, NATHAN
107. GALLAGHER, JESSIE,
108. KOWITT, JEFFREY, 130772H
109. HEITMAN, PETER, 513452D
110. BALLARD BRIAN, 101396C
111. WALKER, DAVID, 204713C
112. MILLER, STAN, 895854D
113. MOORE, AARON, 1164342
114. MIKELS, CHRIS, 513528C
115. WATSON, JASON, 832045D

6

116. MOREHOUSE, GREG, 8809699C
117. CLARK, WILLIAM, 473650B
118. HARDY, JASON, 639368
119. FREY, THOR, 315106B
120. RAY ISOLA, 11365C
121. JEFFEREY, JAMES, 542487E
122. LOUIS CERESA, 642326
123. GUNSET, CRAIG, 637004C
124. HARRRY STORMS, 412161C
125. SAS, NICK, 475573C
126. JASON WOLEK, 949023B
127. ECHBOLDT, WILLIAM,
128. HONAN, KERRY
129. MATHEWS, JAMES, 702797E
130. HOWARTH, JAMES, 261200C
131. second KELLY, KEVIN, 180635D (at Southwoods in 2020)
132. SPANN, ROBERT, 291048C
133. SEELER, GLEN,
134. BOZARTH, JOHN, 1660260
135. GARGANO, JESSE, 372938D
136. GECKELER, ZACK, 1133518
137. HAAR. STEVEN. 125768E
138. CANTRELL, DAN, OSO181211
139. HAMWAY, STEVEN, 390284C
140. MELILLO, PATRICK, 664593E
141. LYNCH, CHARLES, 525800C
142. MIKEY KINSELLA, 500017E
143. HALLSTEIN, AUTHUR, 503570B
144. WILLIAM O'DAY, 718250A
145. MINCHELLA, PETE, 603890E
146. NOONAN, GEORGE
147. PREVENDORSKI, STEVEN, 283478G
148. LASASSO, MIKE, 906347E
149. VISCEL, CHRIS, 444193B
150. ANDERSON, KIETH, 394057C
151. WAYDA, CHRIS, 323308C
152. GREEN, MIKE, 199079C
153. PINTER, STEVEN, 292661D
154. VANLEER, JOESEPH, 326376E
155. CARTY, AUGUSTUS, 641563C
156. FUSCIARDI, STEVE, 469538C
157. ROBBINS, STEVEN, 885491D
158. WISE, MIKE, 467154D
159. KRUZE, WILLIAM, 253236C
160. SULLIVAN, JOHN, 741854E

161. NIBLIC, DERRICK, 197596D
162. BONAVITO, GREGORY, 349682E
163. ZILINSKI, WALTER, 957108B
164. BAKER, JOSEPH, 482150
165. BROWER, ROBERT, 953052

## DEFENDANTS

7. Defendant Number One is LAWRENCE AKINS (hereinafter "Defendant Number One" or "Defendant Akins"), whose official position is Chaplain of Religious Services at East Jersey State Prison ("EJSP") during all periods attributed to him in this complaint, and through the date of this complaint.   Defendant Akins is being sued in his official capacity and individual capacity.   Defendant Akins is involved in this case as a result of having acted under color of state law, and with malicious intent, to cause the issues attributed to him in this complaint, and/or having been directly involved in but nevertheless deliberately indifferent to the issues listed in this complaint, by having threatened retaliation and then retaliated against Plaintiffs as described in this complaint, and having acted with malicious intent to deprive Plaintiffs of their religious and equal rights at EJSP.

8. Defendant Number Two is MALACHIA BRANTLEY (hereinafter "Defendant Number Two" or "Defendant Brantley"), whose official position is Chaplain of Religious Services at Northern State Prison ("NSP") during all periods attributed to him in this complaint, and through the date of this complaint.   Defendant Brantley is being sued in his official capacity and individual capacity.   Defendant Brantley is involved in this case as a result of having acted under color of state law, and with malicious intent, to cause the issues

8

attributed to him in this complaint, and/or having been directly involved in but nevertheless deliberately indifferent to the issues attributed to him as listed in this complaint.

9. Defendant Number Three is WARREN WILCOX (hereinafter "Defendant Number Three" or "Defendant Wilcox"), whose official positions are Religious Issues Committee member and Chaplain of Religious Services at New Jersey State Prison ("NJSP") during all periods attributed to him in this complaint, and through the date of this complaint. Defendant Wilcox is being sued in his official capacity and individual capacity. Defendant Wilcox is involved in this case as a result of having acted under color of state law, and with malicious intent, to cause the issues attributed to him in this complaint, and/or having been directly involved in but nevertheless deliberately indifferent to the issues attributed to him as listed in this complaint.

10. Defendant Number Four is MARCUS HICKS (hereinafter "Defendant Number Four" or "Defendant Hicks"), whose official position was Chair of the Religious Issues Committee ("RIC") for the New Jersey Department of Corrections until approximately the spring of 2018, and whose official position has since been Commissioner of the New Jersey Department of Corrections during all subsequent periods in which he is mentioned in this complaint, and through the date of this complaint. Defendant Hicks is being sued in his official capacity and individual capacity. Defendant Hicks is involved in this case as a result of having acted under color of state law, and with malicious intent, to cause the issues attributed to him in this complaint, and/or having been directly involved in but nevertheless deliberately indifferent to the issues attributed to him as listed in this complaint.

9

11. Defendant Number Five is VICTOR LEE (hereinafter "Defendant Number Five" or "Defendant Lee"), whose official position was and still is Coordinator of Religious Services for the New Jersey Department of Corrections during all periods attributed to him in this complaint, and through the date of this complaint. Defendant Lee is being sued in his official capacity and individual capacity. Defendant Lee is involved in this case as a result of having acted under color of state law, and with malicious intent, to cause the issues attributed to him in this complaint, and/or having been directly involved in but nevertheless deliberately indifferent to the issues attributed to him as listed in this complaint.

12. Defendant Number Six is MICHELLE RICCI (hereinafter "Defendant Number Six" or "Defendant Ricci"), whose official positions were and still are Religious Issues Committee member and Director of the Division of Operations for the New Jersey Department of Corrections during all periods attributed to her in this complaint, and through the date of this complaint. Defendant Ricci is being sued in her official capacity and individual capacity. Defendant Ricci is involved in this case as a result of having acted under color of state law, and with malicious intent, to cause the issues attributed to her in this complaint, and/or having been directly involved in but nevertheless deliberately indifferent to the issues attributed to her as listed in this complaint.

13. Defendant Number Seven is STEPHEN D'LLIO (hereinafter "Defendant Number Seven" or "Defendant D'llio"), whose official position is Assistant Commissioner to the New Jersey Department of Corrections during all periods attributed to him in this complaint Defendant D'llio is being sued in his official capacity and individual capacity. Defendant D'llio is involved in this case as a result of having acted under color of state law, and with

10

malicious intent, to cause the issues attributed to him in this complaint, and/or having been directly involved in but nevertheless deliberately indifferent to the issues attributed to him as listed in this complaint.

14. Defendant Number Eight is THE STATE OF NEW JERSEY ("New Jersey" or "Defendant Jersey"). Defendant Number Eight is being sued as a result of not fully recognizing Plaintiffs' religion, depriving Plaintiffs of their religious rights and their rights to equal protection, and additionally creating substantial burdens on Plaintiffs as described in this complaint, at all times listed in this complaint, and through to the filing date of this complaint.

15. Defendant Number Nine is PHIL MURPHY ("Defendant Murphy"), whose official position has been Governor of the state of New Jersey since January of 2019, through to the date of the filing of this complaint. Defendant Murphy is being sued in his official capacity and individual capacity. Defendant Murphy is involved in this case as a result of having been made aware of the conditions described in this complaint as of May of 2019 by way of legal notices and other notifications and also having played a direct role in some of the decisions that led to some of the conditions listed in this complaint, which allowed Plaintiffs to continue enduring and/or caused Plaintiffs to endure significant burdens related to their sincerely held religious beliefs from May of 2018 until present as described in this complaint and additional filings. Defendant Murphy was aware of but nevertheless violated known laws regarding the religious rights, equal rights, prison conditions, and other issues listed in this complaint and additional filings.

16. Defendant Number Ten is Universal Healthcare ("Rutgers" or "Defendant Rutgers"), who provides healthcare to prisoners within the New Jersey Department of Corrections.

11

Defendant Number Ten is involved in this case as a result of having acted under color of state law and as an individual organization from September 21, 2016 until present to instill practices and policies that caused and/or contributed to the suffering described in this complaint, and/or having been deliberately indifferent to the denial of religious rights, denial of medical treatment, and the resultant suffering described in this complaint.

17. Defendant Number Eleven is the UNITED STATES OF AMERICA. Defendant Number Eleven is involved in this case as a result of having instilled and selectively upheld or enforced laws, rules, policies, and procedures that caused significant burdens and deprivations of religious rights and denial of equal rights to Plaintiffs as described in this complaint. Defendant Number Eleven is being sued for declaratory and injunctive relief, and for nominal, punitive, and compensatory damages as described herein.

18. Defendant Number Twelve is JOHN DOE (hereinafter "Defendant Number Eleven" or "Defendant John Doe"), whose official position was one at New Jersey Department of Corrections that allowed Defendant John Doe to have at least one Plaintiff in this case shipped out of East Jersey State Prison in August of 2019 in retaliation for having filed administrative and legal complaints against the defendants listed in this complaint. Defendant John Doe is being sued in his official capacity and individual capacity. Defendant John Doe is involved in this case as a result of having acted under color of state law, and with malicious intent, to cause the retaliations attributed to him in this complaint, and/or having been directly involved in but nevertheless deliberately indifferent to the retaliations attributed to him in this complaint.

19. Defendant Number Thirteen is JPAY ("Defendant JPAY" or "JPAY"), who provides a tablet, kiosk system, entertainment, and access to the DOC's grievance system for prisoners

12

in the New Jersey DOC. Defendant JPAY is involved in this case as a result of having acted in its individual and/or official capacities, under color of state law, to cause, and/or having been deliberately indifferent to the causes described in this complaint and the attached motion. Defendant JPAY discriminated against Plaintiffs by banning photographs that are required in Plaintiffs' religion but frowned upon by other religions, and by impeding Plaintiffs' ability to access the grievance system freely. Defendant JPAY caused Plaintiffs in the DOC to be placed in harm as a result of providing a system that ensured batteries would rupture and/or explode. Defendant JPAY thwarted Plaintiffs' ability to access the prison grievance system as described in this complaint. Defendant JPAY engaged in bait-and-switch tactics by advertising a "new Player" and a power cord and FM radio with their product, but then providing a used player and not providing a power cord, and providing a product that does not get reception for FM radio, which led to and still leads to Plaintiffs having tablets that regularly stop working and/or don't work properly, having to pay for batteries, and having to purchase music. Defendant JPAY has failed to provide funds sent to them for Plaintiffs and will not respond to ongoing complaints about the missing funds. Defendant JPAY provided batteries that cannot be charged but have to receive a charge from their kiosk system, provided devices that regularly stop working, advertised services (including e-books and the newsstand) that contributed to Plaintiffs purchasing the JPAY devices and originally cost money, but don't work, and failed to provide enough kiosks for the amount of users and failed to regularly upkeep kiosks so Plaintiffs can readily access the grievance system and other JPAY functions. Defendant JPAY additionally failed to ensure that Plaintiffs' confidential medical information is kept confidential from DOC staff. Defendant JPAY is also

13

involved in this case as a result of charging Plaintiffs in the NJDOC for news and books that were free, and for not giving Plaintiffs ready access to the content they had within the JPAY system (leading to songs, books, and other content to be "in the cloud," and/or "fetching" for months at a time).

20. Defendant Number Fourteen is JANE DOE (hereinafter "Defendant Number Thirteen" or "Defendant Jane Doe"), whose official position was a position at New Jersey Department of Corrections that allowed Defendant Jane Doe to have 8 Plaintiffs at Northern State Prison moved from B-i-East and dispersed throughout the prison based on their religion. Defendant Jane Doe is being sued in her official capacity and individual capacity. Defendant Jane Doe is involved in this case as a result of having acted under color of state law, and with malicious intent, to cause the discrimination-based behavior attributed to her in this complaint, and/or having been directly involved in but nevertheless deliberately indifferent to the retaliations attributed to her in this complaint. Defendant Jane Doe is also involved in this case as a result of being deliberately indifferent to Plaintiffs in the NJDOC not having safe forms of eating utensils, and this Defendant is responsible and/or deliberately indifferent to extreme delays in the administrative grievance system, as described in this complaint. Defendant Jane Doe is also responsible for and/or deliberately indifferent to issues related to the mattresses and top bunks in the NJDOC.

21. The preceding paragraphs are implied as if set forth in full throughout this complaint, with Plaintiffs being collectively referred to as "Organic Believers," "Asatru Members," "Organic Practitioners," "Asatru Believers," "Asatru Practitioners," or "Plaintiffs" if not specifically named.

14

22. **Exhaustion of Remedies**. Plaintiffs declare under penalty of perjury that they have
exhausted all administrative remedies for the issues listed in this complaint, through the
use of paper and electronic inquiries, grievances, grievance appeals, final reviews, appeals
to the Religious Issues Committee, and appeals to the Division of Operations and the
Commissioner of the Department of Corrections, and letters to the ombudsman, followed
up by appeals and complaints to Defendant Murphy and Tort notices for state claims, and
all relevant exhaustion has been made regarding claims against the United States of
America, University Healthcare, and JPAY.

## CLAIMS

### Count One

DEFENDANTS AKINS, WILCOX, AND BRANTLEY HAVE DENIED AND
CONTINUE TO DENY PLAINTIFFS THE ABILITY TO PRACTICE THE
RELIGION OF ASATRU AS IT HAS ALREADY BEEN APPROVED WITHIN
THE NJDOC, AND DEFENDANTS LEE, RICCI, D'LLIO, HICKS, MURPHY,
AND NEW JERSEY HAVE BEEN AND CONTINUE TO BE DELIBERATELY
INDIFFERENT TO SAID DENIALS.

23. The New Jersey Department of Corrections ("DOC") issued a 2004 Internal Management
Procedure ("IMP") document titled "PCS.002.REL.004.Odin," which requires all
chaplains within the DOC to allow plaintiffs to 1) congregate for study gatherings and
worship services, 2) make offerings of food, drink, and music during regularly scheduled
"blot" and "sumbel" rites, 3) gather to observe at least 31 Holy Days a year, 4) have each
prison  approve specific Holy Days for local kindreds, 5) have access to approved ritual
and ceremonial items and offerings, 6) have pork, and 7) have outdoor services.  In 2008,

15

the IMP was reviewed and approved by Defendant Marcus Hicks, who was Chair of the Religious Issues Committee at the time (he has since become Commissioner).

24. The first five elements are required under the IMP for Asatru, but they are either directly or constructively denied in all instances throughout the NJDOC, as described in this complaint.

25. Although the last two elements are listed in the IMP as only being permitted and preferred rather than being required, there is no governmental interest in denying the last two approved and preferred elements, and similar religious groups receive comparable accommodations that are not listed as being approved or preferred by their IMP documents.

26. Plaintiffs incarcerated within most NJDOC facilities are not given any gatherings at all. The few prisons that do permit gatherings will not allow plaintiffs to observe approved holy days or have access to approved items that are needed in order for plaintiffs to perform the rites that are approved for Asatru.   Some chaplains have chosen to allow only study gatherings without allowing any form of worship service; others won't allow the approved study groups, and instead allow a worship service in name only, as they do not allow Plaintiffs to use any essential items or food and drink offerings, or make any song offerings or noise of any kind,  or do anything that is needed for a rite to be performed.

27. Plaintiffs are not given access to the following items that are approved by the IMP for Asatru: 1) a Stalli (an altar); 2) an altar cloth that can also serve as a Kindred Banner; 3) a sacrificial bowl (a Bowli, which must be made of natural material, and is used to hold the drink offering); 4) an Aspergillum (evergreen twig); 5) a Gandr (a wooden wand from a fruit-bearing tree); 6) a Hlath (rune-inscribed headband); 7) an oath Ring; 8) a Mead Horn;

9) Pictures of Gods and Goddess to be displayed on the altar; and 10) a Thor's Hammer

medallion.

### Count Two

PLAINTIFFS INCARCERATED WITHIN NJDOC FACILITIES HAVE BEEN
SUBJECTED TO SIGNIFICANT BURDENS AS A RESULT OF HAVING
BEEN DENIED PERMISSION TO PERFORM RITES THAT ARE NOT
COVERED BY THE EXISTING IMP FOR ASATRU, BUT ARE
NEVERTHELESS PROTECTED RELIGIOUS ACTIVITIES UNDER
PLAINTIFFS' SINCERELY HELD BELIEFS.

28. Plaintiffs within NJDOC have asked for the IMP to be expanded and for other decisions to

be made that will allow Plaintiffs to practice Asatru as it is supposed to be practiced

according to Plaintiffs' sincerely held beliefs.  These decisions have been either ignored

or denied by Defendants Akins, Wilcox, and Brantley, and Defendants Lee, Ricci, D'Ilio,

Hicks, and Murphy have been deliberately indifferent to said denials.  Plaintiffs have

made requests that include but are not limited to access to the following: Rite-specific

foods, drinks, and other offerings and materials for making certain offerings; access to

organic foods, natural water, and natural hygiene/sanitation products; purification items;

ritual space and items that are acceptable; outdoor gathering space; the ability to use and

retain musical instruments and art supplies for making song and craft offerings; the ability

to purchase and complete DNA tests to ascertain how to realize and strengthen individual

spiritual heredity; access to natural medical treatment and the ability to perform

plant-medicine rites; religious accommodations for plaintiffs housed in administrative

segregation and other restrictive housing units.

17

29. The following paragraphs in this Count describe essential sincerely held beliefs that Plaintiffs within the NJDOC are not allowed to practice.

30. There are several forms of Asatru, and each sect has at least one major belief or practice that sets it apart from the other sects.   In the DOC, Plaintiffs have been deprived of the ability to practice their specific sects of Asatru, despite having formally requested permission from Defendants Akins, Brantley, and Wilcox, and despite having formally appealed to Defendants Lee, Ricci, D'Ilio, and Hicks.

31. Because of a lack of willingness to consider some key differences between a few of the Asatru sects, Defendants within the NJDOC force Plaintiffs to either not practice their specific sect, or to conform to an opposing sect.   Two major rifts between some sects exist.   The first is that some sects oppose being called Odinists because they believe all of their deities are equal and Odin should not be listed above all others, and because some Odinists don't accept followers who do not follow exclusively Norse versions of the religion and do not have what they consider   exclusively Scandinavian genes. whereas most other Asatru groups embrace a much broader spectrum of backgrounds and beliefs, including everything from Neolithic European practices to Hindu and Shinto practices. Many Asatru members are offended by being called Odinists, and many adherents to Odinism are offended by being called Asatruar (the plural word for members of Asatru). The second major rift is between sects who believe that followers must live a completely organic lifestyle and avoid all things that are unnatural, and sects who believe organic living is mostly optional, but that offerings to the Nature deities must be organic.   Forcing Plaintiffs to practice one or the other of these sects or be called by one or the other of the names of these sects is particularly offensive and burdensome.

32. The IMP for Plaintiffs lists Odinism and Asatru, but the DOC forms Plaintiffs must fill out use only the words "Odinism" and "Odinists," and the callouts are usually announced as Odinists, without any mention of Asatru. This is offensive and burdensome to anti-Odinists followers, who feel they are not accepted by most Odinist groups, and who feel that the term is offensive to their other deities. Some Plaintiffs feel so passionately about this that they will not sign paperwork that is necessary to go to the callouts, and others have stopped going when the Odinists are called out. Some sects of Asatru consider it a taboo to mingle with Odinists. To resolve this conflict, Plaintiffs have asked that the paperwork and callouts mention Asatru instead of only Odinism, but these requests and appeals have been ignored. There is also a problem with many paper forms and callouts grouping Plaintiffs together with Wiccans, which is significantly offensive. In some instances, Plaintiffs are forced to share their gathering space and time with Wiccans, despite that there are major conflicts between the two groups. and despite that each group has its own IMP. At best, this cuts Plaintiffs' gathering times in half and makes them endure Wiccan activities and speech for the other half. At worst, it is a taboo for some Plaintiffs to mingle with Wiccans, whom they consider to conjure negative energy and offend the deities and ancestors.

33. The Organic form of Asatru is made up of Plaintiffs who call themselves Organic Believers. Most plaintiffs are Organic Believers (over a hundred of the ones named in the DOC). Organic Believers are unable to practice their version of Asatru in any ways within the DOC. The following paragraphs describe some of the beliefs and practices that are ignored by the DOC defendants.

19

34. Organic Believers are animists who sincerely believe all things that exist have a spirit, and they cannot eat or drink any foods or beverages that have not been treated with organic hospitality, meaning they have never been subjected to any negative emotions and thoughts or toxic chemicals, including but not limited to fertilizers, pesticides, synthetic nutrients, or other chemicals, or any foods or beverages that have been given any food or water that has been subjected to said toxins.   The   foods for Organic Believers must be properly prepared and sacrificed (i.e., slaughtered or harvested according to Organic Believer laws), and ritually charged and otherwise prepared by Organic Believers less than three hours prior to being consumed.

35. Organic Believers sincerely believe they must use only natural products for personal hygiene and sanitation, and they believe failing to perform personal hygiene and sanitation purification rites regularly, or coming into contact with any objects that have not been subjected to ritual purification, or sharing living space and sanctuary areas with anyone who does not practice organic personal purification rituals are all prohibited by their religion and render them both impure and guilty of polluting the Earth Mother and fellow members of their Nature Congregation.

36. Organic Believers sincerely believe they must embrace global shamanism that requires them to participate in specific rituals, most of which must be conducted outdoors at precise times to collectively keep the cosmic order from being undone.

37. Organic Believers sincerely believe they must create, tend to, meditate with, harvest from, and absorb all safe forms of plant life.

20

38. Organic Believers sincerely believe they must perform some type of yoga, often in the form of Rune Yoga, every single day on meditation mats and with meditation cushions and/or pillows.

39. Organic Believers sincerely believe they must create, offer, and absorb "sacred substances" that are collectively referred to as Soma and/or Mead, which includes but is not limited to fermented plant products, distilled spirits, cannabis, mushrooms, tea, tobacco, and other such natural products that allow for necessary trance-like states of meditation to be entered into by the absorption of the essence of these sacred and deified products.

40. Organic Believers sincerely believe they must use plant medicine and avoid all forms of modern medicine except emergency surgeries in the case of accidents and other injuries, and Organic Believers sincerely believe they can never consume any unnatural pain relief, but instead must absorb sacred cannabis/marijuana to treat pain ritually.

41. Organic Believers sincerely believe they must perform all of the sacred rites their ancestors performed, including but not limited to tantric exercises, giving offerings to the land spirits upon exiting a building and to house and room spirits upon entering a house or room, and having plants and the elements around them at all times, including during sleep.

42. Organic Believers sincerely believe they must create and have fire, soil, moving air, and moving water present during all of their congregate and personal rites, and they must also perform these rites outdoors most of the time, but sometimes at night near open windows where the deities and Nature Spirits can enter and be seen.

43. Organic Believers sincerely believe that each Organic Believer must perform rites that are linked to his or her individual heritage because they sincerely believe that each family has a

multi-generational spiritual existence, requiring them to conduct DNA tests to learn how each Organic Believer must personalize his or her rituals for private rites.

44. Organic Believers sincerely believe plastic, concrete, polyester, and other unnatural materials have a negative metaphysical impact on sanctuary areas and therefore cannot be used for any purification practices, rituals or ceremonies, meditation, exercise, eating or drinking, or sleep.

45. Organic Believers sincerely believe they must cut and dry many herbs and other plant life, and collect and store oils that are required for rites that include but are not limited to rune-cast offerings, and these ritual and ceremonial plant products cannot be handled by anyone who belongs to any religion that has attempted to or is still attempting to destroy paganism or exterminate pagans.

46. Organic Believers sincerely believe they must have stone and wooden circles for performing rites indoors and outdoors and that the areas and Plaintiffs bodies must be heated and cooled during most circular rites.

47. Organic Believers sincerely believe they must never perform any rites in an area that has been defiled by rituals from religions that have tried or are trying to destroy paganism or exterminate pagans.

48. Organic Believers sincerely believe they must use foods and drinks that heat and cool their bodies during many of their shamanic rituals and ceremonies.

49. Organic Believers sincerely believe they must take hot and cold baths that require them to submerge their entire bodies in liquids that contain various herbs and oils, which change according to seasons and the purpose of each ritual purification, and Organic Believers

22

sincerely believe they must perform Sauna and other heating rites for shamanic rites that heat and cool the body through external conditions.

50. Organic Believers sincerely believe each member of a local community must contribute to a group fund that stores valuables and uses them for the betterment of the overall community.

51. Organic Believers sincerely believe they must protect the Earth Goddess by recycling and by cleaning up litter whenever possible , and must never contribute to the destruction of Mother Earth or their fellow members of the Nature Congregation.

52. Organic Believers sincerely believe they must create, use and mark/tattoo runes, ogahm, numbers, and other symbols and images on their bodies, cards, stones, staves, shells, dice, and other ritual artwork, and these sacred items must be created by Organic Believers and never defiled by being handled by anyone who belongs to a religion that has tried or is trying to destroy paganism or exterminate pagans; Organic Believers must also avoid touching or being around symbols from supremacist mainstream religions that represent the destruction of paganism.

53. Organic Believers sincerely believe they must avoid rust, which is present in many cells, in the security toothbrushes, and on exercise equipment in prisons.

54. Organic Believers sincerely believe performing their rites requires specific seasonal plant and animal foods and drinks and deity-corresponding foods and drinks, and specific items that Plaintiffs in the DOC are not currently permitted to possess or use, including but not limited to corresponding plants foods that begin as parts of living plants and are then ceremoniously chosen (via rune castings), harvested, and turned into bannocks, bread-beasts, and animal crackers that must be sacrificed in lieu of animals for daily,

23

weekly, monthly, and seasonally appropriate gatherings.   Each sacrifice, both as individuals in their personal rites, and as group members during gatherings, must contain specific foods, drinks, colors, images, scents, sounds, activities, and textures that correspond to the meanings of each rite and the season or seasons in which each rite takes place, and which have been used in these rituals for more than one generation by Plaintiffs' ancestors.   For group rites, all people who attend the rite are required to bring at least three types of token offerings to be used in the rite; the offerings must consist of a form of food or drink, art, and a seasonally appropriate craft.   For each of the daily, weekly, monthly, and seasonal turning points in the sun wheel and the moon phases, the Laws of Correspondences must be applied.   Each holy tide's specific traditions, decorations, songs, and food and drink offerings are key factors in these daily rituals and seasonal sun-wheel-turning and monthly moon-maintenance ceremonies.   At least one of the daily rites must take place outdoors, and offerings must be ceremoniously brought out for the Nature deities (also referred to as Nature Spirits, Land Spirits, and Land Wights) every day, and brought back in for the house spirits and room spirits upon returning indoors every day.

55. Plaintiffs sincerely believe they must never enter a room, building, or area without making offerings to the spirits in the newly entered space.   These offerings are not always food and drinks, but whenever an Organic Believer eats or drinks, he or she must set aside offerings for the deities, ancestors, and spirits, and must keep offerings on hand at all times in case signs of Nature indicate that an offering must be made to a storm, the wind deity, animals, etc

56. Plaintiffs sincerely believe they must create and maintain physical and metaphysical purification with specific organic purification rites for their sanctuary areas and items

24

through the use of practices that include but are not limited to ritual baths, heating and cooling the entire body through the use of sauna-like and ice-water-plunging rites, and the use of items that include but are not limited to vinegar, iodine, distilled water, sea salt, fire, incense, oils, safe and Organic-Pagan-accepted oral hygiene products such as dental floss, baking soda and hydrogen peroxide to brush with, and iodine in which to store toothbrushes.   None of these items are permitted, and no access to them is granted within the DOC.   Only dangerous toothbrushes are sold or provided, and they are meant for single use but only limited amounts are sold or provided.   There are alternative versions of toothbrushes that do not cause damage, but they are not sold or provided.

57. Plaintiffs sincerely believe they must perform herbal-medicine and plant-magic rituals and avoid all forms of unnatural medical practices.   None of this is permitted for Plaintiffs in the DOC, and the opposite is often forced through mandatory TB tests, X-rays, blood tests, prescriptions, etc.

58. Plaintiffs sincerely believe they must maintain natural indoor and outdoor gardens and have sanctuaries that consist of a World Tree, a Sacred Well, a Sacred Fire, a Sacred Library and Study area, spaces for private quiet meditations, and an exercise area.   Despite that there are garden areas in almost all of the prisons and a greenhouse in EJSP, and indoor plants in all prisons, Plaintiffs in the prison system are not allowed to have plants or access to plants. even though they can be around the plants from other religions that don't require plants.

59. Plaintiffs in the DOC do not have access to any organic foods and natural hygiene products, or other religious items that have not been poisoned with chemicals, mistreated, improperly created or prepared, and otherwise tainted, but Plaintiffs sincerely believe they

must protect the goddess Jorth (the earth) and her inhabitants by consuming and/or using only organic foods and water, and by using only natural soaps, detergents, clothing, ritual items, bedding, and other products.

60. Plaintiffs sincerely believe some of their ritual and ceremonial meals must be made up of exclusively liquid plant foods that cannot be prepared with any containers or utensils that have ever been in contact with any animal products. Ritual food preparation and other such considerations are permitted for Jewish, Christian, and Muslim prisoners, but not for Plaintiffs within the DOC, who have no way of creating requisite liquid sacrifices.

61. Plaintiffs sincerely believe they must keep living plants and other members of their Nature Congregation around them at all times and they believe they must meditate with living plants and other members of their Nature Congregation several times a day, including but not limited to plant presence during sleeping rituals and the practice of morning exercises (such as rune yoga), which require a meditation mat, dream pillow, and meditation cushion (all of which must be made of natural materials) directly next to plants and direct sunlight, none of which is permitted for Plaintiffs within the DOC, despite that Christians have plants all over the chapels in the DOC, and there are gardens and greenhouses in the DOC prisons where Christian prisoners work with plants on a daily basis, and despite that non-organic Native-American prisoners go outdoors with plant life for weekly services and Muslim inmates can have prayer mats in their cells and have entire areas covered with very large prayer rugs for Islamic congregate services.

62. Most plaintiffs sincerely believe they must perform daily mirror-scrying rituals. Plaintiffs in many sections of the DOC are not permitted to have safe flexible mirrors, despite that they pose no risk in Administrative Segregation ("ad seg").

63. Plaintiffs concede that there are compelling governmental interests that are furthered by not allowing prisoners to freely practice their religion as if they were in the outside world, but Plaintiffs claim that a total ban against almost every aspect of their religion is not the least-restrictive means of furthering said compelling governmental interests, especially when considering the things that are allowed for other groups.

64. Plaintiffs within the DOC are deprived of basic free-speech rights that are being taken away without authority and without notice.   These rights include but are not limited to the ability to create, publish, and profit from books and other such forms of religious expression and religious obligations.

65. Plaintiffs sincerely believe they must create literature as offerings, and create message-spreading literature about their beliefs, publish said literature, and use any profits to further their religious goals of protecting the Earth Goddess and preparing for natural disasters.

66. Several Plaintiffs have been specifically told that they are not allowed to create, publish, or profit from literature, drawings, and sculptures, so they are restricted in their abilities to not only enjoy free speech protected by the First Amendment to the U.S. Constitution, but they are also prevented from exercising said rights to perform their religious obligations to spread messages of their religion.

67. Several Plaintiffs have also had their religious writings and other such creations confiscated and never returned.

68. Plaintiffs within the DOC are not allowed to have privacy while performing basic human functions.   Plaintiffs sincerely believe they must never urinate or defecate in front of anyone else, and they must perform rites that involve balancing the body, mind, and spirit

27

by achieving sexual release (for prisoners, this would be achieved through self-release). At present, prisoners within the DOC are deprived of their rights to live within the parameters of these beliefs.

69. Plaintiffs are not allowed to put up blocks for privacy, they are not given any private time for using the toilet, they must use the toilet in front of other prisoners, and they must also urinate in front of staff for tests that can be taken without this profane measure.

70. Plaintiffs are also forced to conform to the beliefs of mainstream religions when it comes to anything related to sexuality, despite that Plaintiffs' beliefs embrace sexuality and incorporate it into their rites.   Ancient and modern images and writings with graphic sexual depictions and descriptions are central to Plaintiffs' beliefs.   Nevertheless, Defendants are not allowed to have any form of these depictions or descriptions, and Plaintiffs are not allowed to masturbate.   Aside from these restrictions forcing Plaintiffs to conform to the standards and beliefs of an oppositional set of beliefs, it also prevents Plaintiffs from performing their own beliefs.

71. Defendants JPAY, Ricci, D'Ilio, and Hicks have issued bans of books, photographs, and any depictions or descriptions of graphic sexuality or photographs and other images of human genitals.   Plaintiffs have fertility rites, images, and descriptions in their religion, and these objects are used to help Plaintiffs enter into excited states in order to perform functions that have been performed for thousands of years in Plaintiffs' religion.   These completely legal and natural functions, such as becoming mentally and physically aroused and releasing pent-up sexual urges and imbalances, do not pose any harm to anyone if they are performed in privacy, but failing to perform these rites does harm Plaintiffs by preventing them from practicing important aspects of their religion, and by leading to

28

physical damage from neglecting their reproductive organs for long periods. Many

Plaintiffs who have been incarcerated for long periods are now unable to even become

excited without the very items that are banned by Defendants Ricci, D'Ilio, and Hicks.

These defendants have banned and caused their underlings to seize all books on Kama

Sutra and related material, the book "Neolithic Shamanism," replications of ancient images

depicting Frey, Freya, Thor, Sif, and Idunn, the "Prose Edda" and the "Poetic Edda" (which

are approved by the IMP for Asatru), and any photographs of naked humans that are

subjected to arbitrary beliefs about oppositional definitions of modesty and decency.

Defendant JPAY also rejects photographs on this basis.

72. Tobacco is an essential part of Plaintiffs' sincerely held beliefs, mentioned as a form of

offering in publications dating back to Jacob Grimm in the 1800s, and still being used and

mentioned in publications by Asatru leaders in The Troth and influential Asatru shamans

such as Galina Krasskova. Plaintiffs within the DOC have been subjected to removal of

tobacco (for everyone except Native Americans) from the DOC without being given any

treatment to deal with the withdrawals they experience, and nothing has been done by the

DOC's agency defendants or Defendant Rutgers to address this matter, which is still going

on every time Plaintiffs see cigarettes on the television and smell smoke from staff and

Native American Prisoners.

73. Plaintiffs sincerely believe that most of their deities can be accessed only by going

outdoors, and that they must perform outdoor rites every day, but incarcerated Plaintiffs are

often restricted from going outdoors for long periods, and they are never given a sacred

natural outdoor space to perform their rites. They are kept from having what they

sincerely believe is essential physical and spiritual contact with such obvious deities as the

wind god, the sun goddess, the sky god, the earth goddess, and the Nature spirits. Plaintiffs sincerely believe they must have regular contact with these and many other deities that they can contact only outdoors, but Plaintiffs are often kept from these deities for very long periods, whereas other groups are never kept from their deities.

74. The days of the week are named after specific deities that Plaintiffs believe they must honor and make offerings to more so than on other days, but they are kept from these deities and unable to honor them in outdoor settings.   They are also unable to honor them in any alternative ways that have been proposed by some Plaintiffs, who asked to at least be able to gather near windows in lieu of having outdoor contact during times when this   is not prudent in a prison setting.   For example, Monday is named after the Moon god (Moon's Day), and the moon is not always out during daylight hours, but maximum security prisoners are not allowed to be outdoors while it is dark out, so Plaintiffs housed in NJSP have asked that they be able to perform Moon Day rites in front of windows where the moon can be seen.

75. The English language is predominantly Germanic, and most of the words that are not of Germanic origin still derive from Indo-European roots.   These languages are all part of Plaintiffs' ancient Eurasian belief system.   The days of the week in English have the following meanings to the ancient members of Plaintiffs' religion, and to Plaintiffs today:

- Sunday means Sun's Day, when Plaintiffs sincerely believe they must gather outdoors to perform group rites that focus mostly on the goddess Sunna, their solar deity.

- Monday means Moon's Day, when Plaintiffs sincerely believe they must gather outdoors to perform group rites that focus mostly on the god Manni, their moon deity.

- Tuesday means Tyr's Day, when Plaintiffs sincerely believe they must gather outdoors to perform group rites that focus mostly on the god Tyr, their sky deity.

- Wednesday means Woden's Day, when Plaintiffs sincerely believe they must gather outdoors to perform group rites that focus mostly on the god Woden (or Odin, or Godin, the latter being the actual root of the word "God"), their wind deity.

- Thursday means Thor's Day, when Plaintiffs sincerely believe they must gather outdoors to perform group rites that focus mostly on the god Thor, their thunder deity.

- Friday means Frigga's Day, when Plaintiffs sincerely believe they must gather outdoors to perform group rites that focus mostly on Odin's wife Frigga, but also on Frey and Freya, the main fertility deities.

- Saturday means Saturn's Day, when Plaintiffs sincerely believe they must gather outdoors to perform group rites that focus mostly on the gods Njord and Loki, both of whom are the Norse representatives of the Roman god Saturn due to similar attributes and meanings with Saturn.   This is the only day of the week that retained its Roman name after the Germanic tribes had intermingled in large   scale with the Romans during the Migration age, the period in which the Roman Empire was taken over by Germanic tribes through military and political tactics, with the citizens of Rome becoming one with the Germanic Ostrogoths (meaning "Eastern Goths") and   the Lombards (a name that means "Long Beards," recorded in Plaintiffs' ancient myths as having been given to this tribe by the Wind god: Odin).

76. Plaintiffs also sincerely believe they must perform sun-greeting rites every day in an outdoor sanctuary setting, and they believe they must make offerings to many types of Land Spirits and other outdoor deities and beings.

77. Aside from Plaintiffs in most general population settings not being given an outdoor area in a natural space and access to said space to perform these rites outdoors with their deities, Plaintiffs in some areas are not even allowed outdoors for recreation for long periods.   In administrative segregation, Plaintiffs go as long as six days between yard movements, and Plaintiffs in general population in NJSP are not allowed out every day.   During these periods, they are kept from their deities.

31

78. Plaintiffs are also kept from going outdoors for extremely long periods as a result of being sanctioned to loss of recreation. Plaintiffs claim that the DOC sanction of "LORP" is applied to normal recreation rights rather than the incentive recreation privileges the sanction was intended for. In some instances, Plaintiffs have been sanctioned to many months, and even years of LORP, and the sanctions are often applied to only yard days for Plaintiffs in administrative segregation and NJSP's general population, leading to years' worth of not being able to go outdoors and engage with their outdoor deities.

79. Plaintiffs claim that these restrictions are violations of their religious rights, but are also deprivations of their rights to equality in settings where Native Americans and others are given outdoor space and living plants for their rites, and also deprivations of protection against cruel and unusual punishment because extended loss of recreation has a long-term impact that leads to physical and then mental health problems, which has been caused to many Plaintiffs.

80. Defendants Ricci, D'Ilio, and Hicks have been deliberately indifferent to these claims regarding the need for outdoor access, equal outdoor space and time, and equal daily gathering time; they have also all participated in the creation and continuance of Plaintiffs' restricted outdoor access and needs to have vital recreation, sunlight, and fresh air for Plaintiffs in NJSP and in administrative segregation.

81. For equality purposes, it must be noted that inmates of monotheistic faiths are allowed to gather much more often than prisoner plaintiffs, sometimes every single day, and Native Americans are given many outdoor areas throughout the state, with statewide temporary transfers being made to allow them to go to a special sweat-lodge area of one prison in

32

south Jersey. No such accommodations have been made for Plaintiffs, despite that

Plaintiffs have made requests for equal treatment to Defendants Ricci, D'llio, and Hicks.

82. Plaintiffs claim modern information about physical and mental health makes loss of

recreation for long periods cruel and unusual punishment, regardless of how much process

is afforded, but that insufficient due-process protections are given prior to long-term loss of

recreation.

### Count Three

PLAINTIFFS INCARCERATED WITHIN NJDOC HAVE BEEN DEPRIVED
OF EQUAL PROTECTION OF THE LAW AS A RESULT OF THE DENIALS
LISTED IN COUNT ONE AND COUNT TWO, AND IN ADDITIONAL WAYS
IN WHICH DEFENDANTS   ALLOW OTHER GROUPS TO PERFORM
COMPARABLE ACTIVITIES, POSSESS COMPARABLE ITEMS, AND
ENJOY COMPARABLE ACCOMMODATIONS.

83. Defendants Akins, Wilcox, and Brantley have deprived Plaintiffs of equal rights regarding

the following issues, and Defendants Lee, Ricci, D'llio, Hicks, and Murphy have been

deliberately indifferent to said disparate treatment: 1) Equal Gathering Time and gathering

space; 2) Equal Access to Congregational Ritual and Ceremonial Items. 3) Equal portions

of funding available to other groups; 4) Equal Access to Musical Equipment and Practice

Times; 5) Equal Permission to Retain Personal Items Necessary For Rites; 6) Equal

Treatment regarding Restrictions on Number of Participants and Visitors for gatherings; 7)

Equal Purification/Sanitization Products and Abilities; 8) Equal religiously acceptable pain

relief (including medical marijuana and other plant medicines), therapy, and additional

medical and mental-health treatment; 9) Equal Storage Space for religious items; 10) Equal

Literature Displays; 11) Equal Hard-Copy and Digital/Video Notifications; 12) Equal

33

2 of 84 PageID: 34

Access to Copying Services 13) Equal accommodations with living plants for religious
use; 14) Equal Jobs for chaplain clerks; 15) Equal ability to Prepare and handle holy day
foods/drink; 16) Equal Specialized Religious Foods and Drinks; 17) Equal intervention by
the chaplain defendants for housing; 18) Equal access to outdoor worship/ritual/ceremonial
space; 19) Equal access to religious counseling; 20) Equal attempts to obtain out-of-prison
assistance; 21) Equal treatment with banquets; 22) Equal ability to shower prior to
gatherings; 23) Equal access to religiously acceptable addiction programs; 24) Equal
ability to form a non-profit organization; 25) Equal Ability to Write and Publish Religious
Books; 26) Equal Access to audio and video content and equipment, and equal time and
space for members to listen to audio and video content; 27) Equal ability to have outdoor
sanctuary spaces in each prison where no other religious activity can take place, like Native
Americans. 28) Equal space for statewide sauna sanctuary where all members throughout
the state can be temporarily moved and have statewide gatherings for major rites, as is done
with the Sweat Lodge ceremonies for Native Americans; 29) Equal ability to state a
non-profit organization, as is afforded to several other prisoner groups, despite that those
other groups have similar local non-profit groups who serve the same functions as the ones
that are permitted, whereas there is no non-profit plaintiffs can rely upon due to their status
as a minority religion and a minority in prison.

84. Defendants Lee, Ricci, D'Ilio, Hicks, Akins, Wilcox, Brantley, New Jersey, and Murphy
have contributed to the following examples of disparate treatment that prevents Plaintiffs
in the DOC from being able to practice their versions of sincerely held beliefs in manners
equal to the ways in which other groups are allowed to practice their religions.

85. Plaintiffs sincerely believe they cannot share living space or sacrifice space with anyone
   who fails to perform the Organic form of physical and metaphysical purification, or anyone
   who practices any form of monotheistic supremacism and/or other intolerant religions or
   wears and/or displays any hate symbols, including but not limited to certain sects of
   Christianity and Islam, and images of the crucifix, respectfully, and any other religions,
   symbols, words, or other displays that represent polytheists' genocide or otherwise have
   been used to suppress and/or destroy   polytheism and/or torture and kill its adherents.

86. Plaintiffs in the DOC are forced to live with others in cells where Plaintiffs cannot perform
   any form of religious rites due to inmates in the cells having different hygiene practices
   and/or a lack thereof, performing contrary religious practices, displaying   monotheistic
   hate symbols and listening to and singing anti-polytheistic religious music that is offensive
   and prevents Plaintiffs from being able to have a ritually conducive and spiritually and
   physically pure area or being able to concentrate during any attempted meditation or ritual
   studying.   Members of other religions who have been subjected to hate symbols, speech,
   and music are not forced to endure such religiously hostile and offensive environments.
   Defendants New Jersey and Hicks do not allow for Plaintiffs to be moved to single cells or
   choose fellow Organ Believers to lock with, and they are subjected to long periods where
   they are forced to live in such religiously hostile environments, sometimes without being
   able to leave the cells for weeks at a time during lock downs and for longer periods.

87. Defendants Brantley, Wilcox, Akins, and Lee directly caused/cause and/or were/are
   deliberately indifferent to Plaintiffs having to endure hate symbols and sounds, and
   metaphysically tainted areas for the only spaces in which they are allowed to congregate

for religious purposes at EJSP, NJSP, and elsewhere within the DOC in New Jersey.

Defendants Hicks, D'llio, and Ricci have been deliberately indifferent to these problems.

88. Plaintiffs sincerely believe they cannot listen to indoctrinating speeches, songs, and prayers from any groups that have exhibited and/or currently exhibit hatred toward polytheism. However, the only space Plaintiffs are given in most prisons is where other groups are scheduled for the same time periods, so Plaintiffs have to listen to prayers, speeches, and music with inculcating anti-polytheistic messages that interfere with Plaintiffs' ability to study. Plaintiffs consider words and music to be alive, and they believe they must avoid allowing themselves to be invaded by the sounds of anti-pagan hate speech and melodies from supremacist Christians and Muslims who are present in the chapels. Muslims and Native Americans are given their own sanctuary space, and Plaintiffs are required to forfeit their need to chant, sing, and play music whenever they are gathered around any other religious group gatherings for studying or performing rites.

89. Plaintiffs sincerely believe they must fast during specific periods. some of which must be determined by rune castings. These fasts are not honored in the DOC, and scheduling and urine tests often interfere with the fasts and force Plaintiffs to break the fasts to avoid being given institutional charges. Additionally, this does not happen with Muslims during their fasts.

90. Plaintiffs sincerely believe their ritual areas must never be located near toilets or in areas where human waste can be splashed. Toilets in the prison cells do not have lids and are inches away from the bunks, and bodily waste is sprayed all over the cells and Plaintiffs' bodies in the DOC when the toilets are flushed. This is especially offensive in two-man

36

cells, but Plaintiffs' ritual hygiene is not considered in the DOC, though comparative
considerations are given to other groups.

91. Plaintiffs believe they must perform certain rituals that prevent their intense meditation
rituals from being interrupted from the existence of scents and impurities that are trapped
in hair and under finger nails and toenails. As such, those Plaintiffs sincerely believe they
must keep their head hair either bald or very short and they must trim and shave their
facial hair every day, cut their fingernails and toenails every day, and keep only eyebrows
and a shortly groomed goat-tee at most on their heads/faces. Plaintiff in the DOC are not
able to perform these rites, and often can't groom themselves for weeks, months, and even
years in ad seg, but comparative considerations are made for other groups.

92. Some Plaintiffs sincerely believe they must become organic vegans during certain periods
(especially during the month of November or whenever a deity or "greenwight" compels
them to), and some sincerely believe they must maintain an organic vegan lifestyle at all
times except during holy day feasts when ritual animal foods are necessary, but this is not
possible to any extent for Plaintiffs within the DOC. No organic foods or beverages are
provided or permitted, and there is no way to maintain proper nutrition as a vegan even on
the vegetarian diet, which is set up for Muslims and is the only alternative that was ever
given to any of the Plaintiffs in the DOC. Aside from not being organic, not being
prepared according Plaintiffs' Organic-Vegan laws for separating containers and utensils
for plant and animal foods, and not containing foods that are served within three hours of
preparation according to Godian and Organic Odian beliefs, the Muslim diet provided to
vegan Plaintiffs in the DOC contains eggs, cheese, milk, and various other dairy products
that have no actual vegan protein replacement. In contrast, the entire commissary and

37

regular diet within the DOC conform to the Jewish and Islamic religious rules regarding not having pork, and conform to the Christian diet of having fish on Fridays. There is not a single beverage or food item sold or provided that is organic and/or natural, within three hours of preparation, or otherwise fit for Organic-Vegan Plaintiffs to drink or eat. Plaintiffs have offered the alternative of temporarily paying for their own meals and ritual offerings until there is a ruling from the Religious Issues Committee about organic foods, a vegan diet, and natural ritual offerings, and Plaintiffs have even agreed to temporarily limit their food and drink purchases to only the vendors who are already approved by the DOC for food package orders and other source-of-sale orders that have been previously approved, but this has also been verbally denied and/or ignored on paper by the Defendants. The DOC allows all prisoners who are charge free for a year to order food packages twice a year, allows prisoners who are not charge free to order smaller food packages twice a year, and allows prisoners entered into the STEP school programs to order and receive extra incentive food packages two more times per year. Muslims are allowed to have special foods every night of their month-long fast and during their additional holy day meals throughout the year, and Jewish inmates are provided with sealed Kosher trays three times a day. There is no security concern and no financial concern with allowing Plaintiffs within the DOC to order and receive organic foods and drinks from approved vendors until there is a ruling as to what foods and drinks will be provided for Plaintiffs who sincerely believe they must maintain an organic vegan diet of raw plant foods and drinks that have been prepared within three hours of being consumed, and Plaintiffs who sincerely believe their aforementioned sacrifices must consist of living organic foods and drinks.

38

93.     Members of other religions within the DOC have been allowed to use the various repair shops, materials, and tools to design, create, and embellish various wooden items to be used by other members of their religion.   These items include but are not limited to large wooden crosses, banners, Stations of the Cross, altars, pews, and podiums, all of which have specific religious symbols and/or words that make the items clearly designated for specific monotheistic religions.   Plaintiffs sincerely believe they must create similar items, as listed in all of the major publications about the rites within their religion, and Plaintiffs also sincerely believe they cannot use such items that have been created by and/or for monotheists.   Plaintiffs are not given equal ability to design, create, and maintain their own items that meet the criteria for their religion.

94. Although Apple Valley is an approved vendor for food packages, and it was previously one used by prisoners at NSP, this particular prison no longer allows orders to be placed from there, so there is no form of organic food available to Plaintiffs at NSP.   Southwoods State Prison and many other DOC facilities don't allow any form of food package from Apple Valley.

95. The defendants in the DOC deprive Plaintiffs of equal treatment in terms of how other religious groups are treated.   Plaintiffs sincerely believe they must include specific foods, drinks, items, and activities as living members of their rites, just as Muslims are permitted to prepare their own religious foods, break their fasts with dates, and gather every night for an entire lunar month every year, and Catholics are permitted to have the specific communion food and drink that are acceptable in their religion at least one time every week, for all 52 weeks of the year.   The entire menu and commissary has been altered to accommodate Jewish and Muslim people who can't eat pork or use products with pork,

39

Jewish prisoners are given sealed Kosher meals and drinks three times a day, and one of the DOC's approved food-package vendors was specifically chosen exclusively as a Hallal source for Muslims to purchase 100 pounds of Hallal food every year at EJSP, 120 pounds a year at NJSP, and 60 pounds a year at NSP.   Plaintiffs, on the other hand, require 100% organic foods, natural drinks, the ability to congregate for their rites, and the ability to prepare their own ritual food and drink offerings, with foods and drinks that must correspond to the rites, but no accommodations are made for Plaintiffs with the DOC.

96. Food that has been ritually purified by Plaintiffs who attend approved gatherings or order approved food from food package vendors sincerely believe the foods have become living parts of their rites and must be used for more than a single meal, but they are often forced to destroy the foods on the way back from approved gatherings or if they go to administrative segregation.   No other groups are subjected to this type of destruction of sacred foods.   In no instances would Muslims be forced to destroy the dates they are given to break their fasts every night for an entire lunar month of every year, plus their additional gatherings, which equal roughly the same amount of gatherings that are approved by the DOC's IMP for Asatru, but the Asatru rites are spread out throughout the year, with many less days to partake in the Asatru equivalent of communion than what is provided for the 52-plus weekly mass gatherings for Catholics to partake in their form of communion.   Aside from being asked repeatedly to allow Plaintiffs at EJSP to participate in the IMP-Approved Asatru gatherings to perform Asatru's version of communion, Defendants Akins, Lee, and Hicks have been asked to intervene so the administrations and staff members in the DOC can understand and respect the necessity and the complexity of communion foods for

40

animists, but this is not respected, though the dates and other foods for Muslims, and the wafers/matzo and juice for Christians and Jewish inmates are never forced to be destroyed.

97. There is no legitimate reason that Plaintiffs in the DOC cannot receive the same treatment as Native Americans by being given access to herbs that include tobacco, which are controlled by the Chaplains who oversee Native-American Services throughout the DOC. Several forms of tobacco and other herbs are necessary sacred-substance items that Plaintiffs sincerely believe must be used in the form of incense, raw herbal offerings, smoked herbs that must be inhaled and exhaled as offerings to Odin and the four directions, blended in with drink offerings for New-World Soma sacrifices, combined with mint and other herbs and pressed with the teeth for morning Soma-chewing blends, given to the dwarves and ancestors, and thrown raw into the winds.

98. The DOC's IMP for Native Americans allows prisoner to possess a medicine bag "made of cloth or animal skin that is worn by the Native American religious adherents as a means of spiritual protection," but Plaintiffs have been denied the equal right to have a personal skin pouch, which has been used for thousands of years by heathens to carry such essentials as purification items, runes, spices, herbs, oils, incense, mushrooms, nuts, grains, seeds, pebbles, meditation mats, meditation cloths, and dream pillows for ritual purposes, as is described in the Icelandic Sagas and in the cited Eternal Rite booklets, the True-Asatru books, and related Organic Asatru literature that has been provided several times to defendants Akins, Wilcox, Brantley, Ricci, D'llio, Lee, and Hicks.

99. There is no legitimate reason that other groups in the DOC are allowed to have sacred items to use in rituals, while Plaintiffs are denied comparative items. The IMP for non-organic Buddhists allows the use of an altar, cloth, and incense. The IMP for Judaism allows

41

Jewish inmates to possess and use "approved spices," a ram's horn, matzo, grape juice in lieu of sacramental wine, and matzo, and the IMP for Judaism states that "candles or open flames are permitted within the correctional facilities." Non-organic Native Americans are also allowed to use flames, and they are given access to outdoor services and can have "a mixture of items such as but not limited to, bark, dried leaves, sage, cedar, sweet grass, corn pollen," and tobacco, small pebbles, beads, and a ceremonial pipe. Additionally, their IMP states that some of the sacred plant materials must contain "as few additives as possible in order to maintain purity of mixture that is used by Native Americans in religious services," which is no different from Plaintiffs requiring organic food and natural water and hygiene products. Plaintiffs have specifically been denied spices, oils, herbs, pebbles, beads, incense, sacred plants, etc.

100.    Jewish inmates can come out of their cells every day for prayers that cannot be done in their cells, but Plaintiffs are not allowed to perform essential sun greetings, morning rune yoga, Nature Deity propitiation, or any other mandatory daily rites that can't be done in the cells. Muslims are permitted to congregate outdoors every day for group prayers that consist of sometimes two dozen or more individuals in the yards at EJSP, but Plaintiffs are not allowed to perform Rune Yoga or circle chantings. Muslims are also permitted to shower before congregating so they can perform ritual purification rites, but Plaintiffs are not allowed to, and despite that there are showers located in the yards at EJSP. Plaintiffs are not allowed to bring soap to cleanse themselves before and after any religious activities that would be allowed to take place. Nor are Plaintiffs allowed to bring offerings to land spirits outdoors when they leave buildings, which is a requirement of their sincerely held

42

beliefs, despite that the Muslim equivalent of prayer offerings of songs, chants, words, and fragrances are permitted to be offered.

101.    Plaintiffs in NJSP are given less than half the time Native Americans are given to gather.

102.    The IMP paperwork for Native Americans states the following: "There shall be regularly scheduled congregate services, at regular intervals, equal in terms and opportunity to that scheduled for congregate services afforded to all other traditional religions." There is no such equality mandate in any of the IMP paperwork for Plaintiffs who are not Native American, so all Plaintiffs are deprived of equal protection in this regard as well because they are not given equal treatment in terms of the mainstream groups being given well beyond what is permitted in their respective IMP's, while plaintiffs get less than what is provided in their IMP's.

103.    The Holy Days/Festivals section of the Native-American IMP states that "every day is sacred," and they are allowed to have festivals "related to seasonal changes, the phases of the moon, the provision of food and other essentials for life." Plaintiffs are not given the opportunity and means for performing these rites, despite that Plaintiffs have essentially the same sincerely held beliefs. The IMP for Catholics lists 13 holy days in addition to their weekly ability to perform a communion rite, and Muslims get an entire lunar month of daily rites and three others per year in addition to their ability to perform daily outdoor congregate rites and weekly congregate prayer services throughout the year. (It must be noted that the collective holy days for Muslims amounts to 31 days every year, which is the same number that is approved in the IMP for Plaintiffs, but the latter group's

43

are spread out throughout the year, and the latter are not acknowledged even though they are approved).

104.    Each Muslim within the DOC can have two prayer rugs, but Plaintiffs can't have comparable meditation mats and dream pillows, which are essential to their rites. Muslims can also have oils that are appropriate to their beliefs, but Plaintiffs are not allowed to have comparable products essential to their rites.   Plaintiffs' rune-yoga rites, their "under the cloak" rites, and their full-prostration rites require them to have something slightly longer and thicker than the Muslim prayer rugs, but they are forced to conform to the abbreviated Muslim style of prostration and order only Muslim style mats that prevent Plaintiffs from being able to perform many essential rune positions, full prostration, or the same "under the cloak" rite that was performed by such famous Asatru founders and leaders as Odin and Thorgill the Law Speaker in Icelandic historical records.   Buddhists are allowed to have meditation pillows that are no different in comparison to the dream pillows required for Plaintiffs.   Some prisoners with bad backs are given even larger pillows and cushions for sitting upright in the bunks, and some are given mattress toppers for bad backs.   This is no different than what is required for Plaintiffs, but the latter are not given equal treatment for said necessities, or for the required high chair of their religion. (See attached requests and citings.)

105.    There is no different "safety and security concerns" between ordinary prisoners in the DOC being given controlled substances (including opiods and barbiturates), and simply allowing Plaintiffs to be given access to small amounts of controlled ritual alcohol and cannabis for rites, and medical marijuana for pain relief when necessary, which would be the least-restrictive means of furthering the obvious compelling governmental interests

at issue.  Plaintiffs have proposed the alternatives but have been ignored.  The DOC and

Defendant Rutgers have hundreds of prisoners taking an opiod every day, keeping them

steadily doped up on large amounts of Suboxin to "treat" their opiod addictions.  This

removes any claim of there not being a way of treating Plaintiffs pain and other ailments

with legalized medical marijuana instead of leaving to choose between suffering or taking

unnatural medications that are taboos in Plaintiffs religion.

106.      Plaintiffs of other beliefs are given pain relief and other medications for such things

as depression and PTSD with medications that do not contain pork products, so the

medications do not conflict with Jewish and Muslim prisoners' beliefs, but no form of

medical marijuana is permitted for pain relief, depression, and PTSD that is suffered from

by Plaintiffs within the DOC. Aside from plant medicine, healing hands, and other

methods being obligatory rites that must be performed when an imbalance is found, which

results in a present lack of the ability to practice essential parts of Plaintiffs' religion, the

lack of alternatives to unnatural health practices results in Plaintiffs within the DOC

suffering from pain and lack of medical attention, resulting in substantial burdens.  For

Plaintiffs who were released from the DOC, and for Plaintiffs who will be released from

the DOC in the near future, there is no legitimate reason that they should not be allowed to

participate in medicinal rites and ceremonial rites that involve producing, possessing, and

using organic cannabis in lieu of unnatural pain relief and other forms of medication, and

producing, possessing, and using alcohol, distilled spirits, tobacco, cannabis, mushrooms,

and other forms of Soma sacrifices as ex-offenders subjected to supervision, and as

members of the free world in the State of New Jersey and in the United States of American

and its territories.

107.     Likewise, there is also no legitimate reason non-incarcerated Plaintiffs cannot create and use bows, spears, and knives to freely perform hunting rites.

108.     Various groups within the DOC are allowed to have various ritual and ceremonial items, or are allowed to have items that have been made with essential ritual and ceremonial items, but Plaintiffs in the DOC, and especially plaintiffs at NJSP, EJSP, and NSP, are not allowed to have even a single appropriate ceremonial item.   Plaintiffs sincerely believe they must use specific ritual and ceremonial items that include but are not limited to: a mortar and pestle; a blender; offering bowls; spoons; ladles; cauldrons; rune staves, tiles, stones, and cards, dice, and other divination/oracle cards and items, including but not limited to a tea set; casting cloths; altars made of stone or wood; altar cloths; seating made of wood; ceremonial brooms; musical instruments (minimally a stringed instrument, a drum, a flute, and a bell); colored candles; cloak; soil; sea salt; yeast; fresh and natural spring water; headpieces; herbs; spices; oils; incense; Troth Rings (for fingers, necklace, and ceremonial use); Arm Ring (for upper arm); Thor's Hammer to wear and Thor's Hammer for ritual use; Thor's Belts; Thor's Gloves; Sacred Substances, (including but not limited to fermented and distilled beverages, tobacco, and cannabis); ceremonial pipes; feathers; fresh twigs, branches, and leaves; nuts; seeds; grains; fruit; roots; vegetables; berries; mushrooms; buds; sprouts; primitive fire-starting kits; Glodker (fire pot or brazier); meditation beads and strings; ritual art supplies; dream pillows; soil; vinegar; weaving materials; body art materials, and many other necessary items.   (Plaintiffs have spoken with spiritual leaders to come up with this list of essential items for Plaintiffs as a whole, but there are additional items for individual practitioner plaintiffs that are not listed but are nevertheless essential to them.   There are also additional items that would

46

potentially pose security threats in some maximum-security situations, so essential items

such as ceremonial knives, axes, shields, swords, bows and arrows, and spears are agreed

to be symbolically produced with plant foods, clay and/or a combination of organic bread

and natural glue by Plaintiffs in some prison situations, and with IMP-approved plant

materials for edible sacrifices to provide the least-restrictive means of Defendants

furthering the related compelling governmental interests.  However, Plaintiffs without

security threats claim that there is no difference between civilian shop workers observing

prisoners who work with dangerous tools and civilian staff members supervising prisoners

performing rituals that require the use of the aforementioned essential ceremonial

weapons.)

109.    Plaintiffs in the DOC are permitted at best to possess only a personal Thor's

Hammer, which is often denied and/or taken if metal or wood, and even if they are able to

get one, they must go against their beliefs by hiding it under their shirts, whereas other

religious symbols for other prisoners can be displayed, and other prisoners of other faiths

are permitted to have identical if not comparable items/products/access for their religions.

Crosses and other religious medallions are permitted, but Hammers have been being seized

in NJSP and EJSP, and not permitted in SWSP.  For Godian-Asatru plaintiffs, the

hammers must be wooden and made by Plaintiffs according to strict practices.

110.    Plaintiffs sincerely believe they must create and use ritual and ceremonial musical

items with natural materials.  This is not permitted for Plaintiffs in the DOC, though it is

permitted for members of the Christian religion, who are given various times to use

musical instruments in all the prisons, are allowed to possess them in their cells in EJSP

47

without a waiting period, and are allowed to play in a band and have a band play during various Christian services.

111.    Christian groups in the DOC and particularly at EJSP are permitted to have art classes and art products, Muslims are allowed to practice calligraphy and gather to study the techniques for writing Arabic calligraphy, and Native Americans are allowed to retain art supplies to make ritual items, but Plaintiffs are not allowed to perform their essential art rites in most prisons. Plaintiffs sincerely believe they must produce ritual art every day with natural materials, and this ritual art must be used in daily rites as offerings and/or worn, buried, sunken into wells, burned, or placed on shrines and altars. Plaintiffs within the DOC are not allowed to perform any of these rites, and they are not allowed to have statues, shrines or altars, which they sincerely believe they must build up as living spaces that must be set off from normal space and be dedicated exclusively to sacred ritual activities, without ever being subjected to any other activities or the presence of any supremacist monotheists.

112.    Defendants Seven and Ten have deprived plaintiffs of equal religious exemption from state and federal laws that subject plaintiffs to punishment for performing rites that involve alcohol, mushrooms, tobacco, cannabis, and similar sacred substances, animals, fellow believers, chance taking, hunting, fishing, and farming.

113.    Plaintiffs within the DOC are offered only unnatural forms of addiction-treatment medications by Defendant Rutgers and Defendants Murphy and New Jersey, and Plaintiffs within the DOC are also offered only monotheistic-based forms of addiction-treatment programs. The result is that Plaintiffs who are addicted have to choose between

compromising their sincerely held beliefs or not having any form of treatment and programming.

114.     Plaintiffs Nick Alexander and Robert Andersavage left the DOC and died from drug overdoses because said defendants left them with only the aforementioned forms of treatment and programming.   Defendants Akins, Wilcox, and Brantley have done nothing to change this process, and Defendants Lee, Ricci, D'Ilio, Hicks, Murphy, and New Jersey have been deliberately indifferent.

115.     Many Plaintiffs within the DOC were forced in 2018, 2019, and 2020 to participate in monotheistic-based addiction programs in order to get their objective points scores lowered and to have their contact visiting privileges restored.   Defendants Akins, Wilcox, and Brantley have done nothing to change this process, and Defendants Lee, Ricci, D'Ilio, Hicks, Murphy, and New Jersey have been deliberately indifferent.

116.     At NSP, Christian prisoners who are in the Protestant band are allowed to keep their musical instruments in their cells and transport them back and forth from their cells to the chapel for practice days and for worship performances.   Plaintiffs in NSP are not even allowed to possess instruments, let alone transport them.   Members of a non-religious band that is controlled through religious services at NSP are allowed to   keep keyboards, guitars, and other devices (including tuners   and foot pedals) in their cells and transport them back and forth to band practice three times a week, but Plaintiffs are deprived of this opportunity for their religious rites.   Defendant Brantley has not intervened to render this process equal.

117.     Defendants Akins, Wilcox, and Brantley have allowed Catholics to keep large crosses, banners, stations of the cross, candles, and living plants in the chapels, but

49

Plaintiffs are not allowed to have anything other than literature, and even that has been banned in some instances because certain words in the Eddas do not conform to the religious moral standards of said defendants. Defendants Lee, Ricci, D'llio, Hicks, Murphy, and New Jersey have been deliberately indifferent.

118.    Plaintiffs within the DOC are compelled to conform to a monotheistic set of ritual and ceremonial foods and drinks that are approved by the IMP, without consideration of the diversity within their polytheistic religion, which requires specific offerings for each deity. Catholics, Jewish inmates, Native Americans, and Muslims are allowed to have the precise foods and drinks needed for their monotheistic rites. Limiting Plaintiffs to only one set of offerings forces them to conform to monotheistic beliefs and practices. Defendants Akins, Wilcox, and Brantley have done nothing to change this process, and Defendants Lee, Ricci, D'llio, Hicks, Murphy, and New Jersey have been deliberately indifferent.

119.    Members of other religious groups are allowed to transport their JP5 players back and forth from the chapels in the DOC to play religious music and practice it with others, and to read religious literature that is on the tablets, but Plaintiffs are not allowed to do this. Defendants Akins, Wilcox, and Brantley have done nothing to change this process, and Defendants Lee, Ricci, D'llio, Hicks, Murphy, and New Jersey have been deliberately indifferent.

120.    Plaintiffs within the DOC have also been subjected to disparate treatment by defendants Ricci, D'llio, and Hicks by being deprived of the equal ability to start and maintain a non-profit organization, and by not being able to collect, generate, save, and spend group funds for nonprofit purposes.

## COUNT FOUR

PLAINTIFFS WITHIN NJDOC HAVE BEEN RETALIATED AGAINST BY   ALL
DEFENDANTS EXCEPT JPAY AND THE USA FOR PRACTICING THEIR RELIGION
OR ATTEMPTING TO DO SO, AND FOR UTILIZING THE GRIEVANCE AND
COURT SYSTEMS TO HAVE THEIR RIGHTS ENFORCED.

121 Plaintiffs within the NJDOC have been retaliated against

in multiple ways by Defendants.  Plaintiffs have been threatened

that their gatherings will be canceled, they will have their

cells searched and their property destroyed, they will be given

trumped-up charges, and/or they will be moved to less favorable

housing units and less-favorable prisons if they continue to

use the grievance and court systems to complain about issues

listed in this complaint.  After being threatened, some

plaintiffs continued to file complaints, and all of the

threatened actions took place, including having the Plaintiff

who created all of the documents in this case (Planker) shipped

out to a less-favorable prison, and having his legal property

seized and his word processor broken.  Asatru gatherings were

also canceled.  These retaliatory actions took place after the

threats had been made and the court had been notified of some

threats, and after Defendants began being receiving large amounts

of grievance filings and began being served with a complaint

listing issues that are also raised in this complaint.

## COUNT FIVE

PLAINTIFFS HAVE BEEN SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT
BY ALL DEFENDANTS EXCEPT JPAY.

122. Plaintiffs who are currently incarcerated or were recently
incarcerated within NJDOC suffer from and/or have suffered from
cruel and unusual punishment in violation of the State and

51

Federal Constitutions in the ways listed within this complaint, but especially in the following ways for confined Plaintiffs and soon-to-be confined Plaintiffs:

1) No religiously acceptable (organic/natural) food and water;
2) No religiously acceptable (organic/natural) hygiene products;
3) No religiously acceptable medical/mental-health treatment;
4) Unsafe and inadequate sleeping and eating conditions;
5) No consideration for sincerely held privacy/modesty beliefs;
6) No safe places to sit for creating ritual literature/art;
7) Lack of time, space & equipment for ritual/normal exercises;
8) Insufficient lighting, sunlight, recreation, and sanitation;
9) Lack of acceptable treatment and programs for addictions;
10) Worn-out mattresses and pillows and lack of pillows;
11) Lack of gloves, scarves, and sufficient cold-weather coats;
12) Lack of safe cups, bowls, utensils and dish detergent;
13) Lack of religious counseling and spiritual fulfillment;
14) Lack of lasting laundry bags and efficient laundry services;
15) Lack of place, time, and equipment to clean clothes;
16) Lack of place to hang wet and damp clothes;
17) Lack of safe oral hygiene items and regular cleanings;
18) Lack of training and enforcing safe hygiene;
19) Mental and emotional injuries caused by physical injuries.

123. The conditions listed above and throughout this complaint have led and/or will lead to cruel and unusual punishment for long-term confined Plaintiffs, in most instances with irreparable harm, due to Defendant Murphy's, Defendant New Jersey's, and the DOC Defendants' actions and/or inactions that have resulted in direct rulings by some Defendants and deliberate indifference by others. Without having any form of natural treatments, incarcerated and potentially incarcerated Plaintiffs suffer from or will suffer from pain, depression, digestive problems, dehydration, malnutrition, injuries and scars from falling off top bunks that lack steps and handles, back and neck injuries from worn mattresses and worn pillow or lack of pillows, inability to maintain proper posture, arthritis, migraines, dangerous shifts back and forth between unsafe weight loss and obesity, high blood pressure and blood in urine samples and bladder cancer in at least one instance (Plaintiff Planker), loss of muscle structure, restless leg syndrome, problems with vision that resulted from poor lighting and long-term confinement to cells without being able to absorb sunlight or look at anything from a distance, fungal infections and other skin diseases from lack of safe ventilation, lack of cleaning supplies, insufficient shower time and showers that are scalding hot and non-ventilated, cells and showers that are mold infested and not cleaned properly, and forced confinement with cellmates who are not taught/forced to practice safe hygiene. Aside from being Eighth-Amendment violations for incarcerated, and soon-to-be-incarcerated Plaintiffs, and for Plaintiffs on parole and probation, the previously following listed conditions also violate said Plaintiffs' religious rights and their equal

rights under the N.J. and U.S. Constitutions, the New Jersey Torts Claims Act, RLUIPA,

RFRA, and any other authority.

## Count Six

DEFENDANTS SEVEN, EIGHT, AND TEN HAVE DEPRIVED PLAINTIFFS ON PAROLE AND PROBATION OF THE ABILITY TO FREELY PRACTICE THEIR SINCERELY HELD BELIEFS, RESULTING IN SIGNIFICANT BURDENS.

124.    Plaintiffs on parole and probation are not allowed to perform hunting and fishing

rites, and are not allowed to engage in rites that require them to create, possess, and use

bows, arrows, and knives, or produce, posssess, and consume sacred substances that

include but are not limited to brewed and distilled alcohol and cannabis.

## Count Seven

DEFENDANTS MURPHY, NEW JERSEY, AND THE UNITED STATES OF AMERICA HAVE DEPRIVED PLAINTIFFS IN SOCIETY IN THE STATE OF NEW JERSEY AND ELSEWHERE WITHIN THE UNITED STATES OF AMERICA OF THE ABILITY TO FREELY PRACTICE THEIR SINCERELY HELD BELIEFS, RESULTING IN SIGNIFICANT BURDENS.

125.    Plaintiffs who lack the funds or are subjected to state and federal obstacles and

penalties, which they cannot overcome or will not risk receiving, are unable to freely

practice rites involving ritual chance taking and divining, gifting, house-guest rites, funeral

rites, coming-of-age rites, making certain sacrifices, consuming certain foods, and other

rites listed in the attached list of prohibited rites.

53

## Count Eight

DEFENDANT AKINS HAS ACTED IN HIS OFFICIAL AND INDIVIDUAL
CAPACITY, UNDER COLOR OF STATE LAW, WITH MALICIOUS INTENT,
TO COMMIT DISTINCT CIVIL CRIMES AGAINST PLAINTIFFS AT EJSP.

126.     Contrary to the requirements of the IMP, Defendant Akins has allowed plaintiffs at

EJSP to gather only on dates near to the solstices and equinoxes, but not on the precise

dates of the solar events, and usually at night when the sun is not present. None of the 27

other approved holy days are acknowledged, and the groups' specific holy days have not

been locally approved, and Defendant Akins will not intervene to help.

127.     Defendant Akins has refused to ensure that all plaintiffs at the prison are placed on

the holy day list for the only four holy days he approves. leading to several plaintiffs being

deprived of gathering for one or more of the four High Holy Days. With other groups,

Defendant Akins and his staff members sit down with members and have them proof read

the holiday pass list to let them make sure that all of their members are listed, but he will

not let Plaintiffs see their holy day list ahead of time, leading to several names being

omitted and several Plaintiffs not knowing until they are turned away on the holy day. For

example, each of the following plaintiffs were kept off at least one of the solstice and

equinox gathering lists at EJSP in 2018 and 2019: Dehaven, Lucas, Atwell, Crow, Ramm,

Helm, Shaver. Dougherty, Planker, and Cassella.

128.     Defendant Akins also limits Plaintiff's study group list to only 15 people at a time (a

restriction not applied to other groups), and then limits the holy day list to only people who

are on the restricted list.

129.     Defendant Akins also refuses to allow Plaintiffs to have an actual worship service at EJSP, and instead gives them only a study time.

130.     For several weeks, Defendant Akins withheld musical instruments that were sent into EJSP for plaintiffs out of spite in 2019, and had Godian gatherings cancelled in 2020.

131.     Defendant Akins allowed all other groups to participate in a Thursday Night gathering where a free forum of religious topics were spoken about and studied, but told three plaintiffs that they could not participate and that they and all other Asatru members were not allowed to attend again, simply based on Asatru members being the only group not allowed to use the open callout night to gather.

132.     Defendant Akins would not contact volunteers or reach out to find information and volunteers for Asatru groups at the prison, despite having been given several names and information.

133.     Defendant Akins would not obtain, download, or print out free Asatru literature for plaintiffs, despite having been given plenty of information and requests to do so.

134.     Defendant Akins was instructed by the administration to accommodate Plaintiffs with equal treatment, but did not do so.

135.     Defendant Akins has also deprived Asatru members in his prison of having equal callouts and gathering times, equal access to musical equipment, equal ability to have the foods, drinks, items, and accommodations necessary to perform their rites, equal ability to prepare their own foods and have foods and drinks that are religiously appropriate, and the ability to otherwise enjoy equal treatment as listed elsewhere in this complaint.

136.     Members of other religions are allowed to have their musical instruments, religious foods and drinks, prayer rugs, and other such items in their cells at EJSP, but Plaintiffs are

not allowed to have similar items that fit the requirements of Organic Asatru, and Defendant Akins will not intervene.

137.    Defendant Akins allows other religious groups and inmate groups to use all of the musical and sound equipment from religious services and the recreation department, but will not allow plaintiffs to use it.

138.    Defendant Akins schedules and allows over thirty callouts a week for Christians and over twenty callouts a week for Muslims, but has deprived Plaintiffs of more than a single callout a week, on a day that is often canceled for cleaning and for other reasons.

139.    Defendant Akins intervenes to ensure that Christians are able to lock with fellow Christians, but will not do the same for Plaintiffs.

140.    Defendant Akins allows Native Americans and others to do such things as gather outdoors, smoke tobacco, use candles, etc. but will not allow Plaintiffs to gather outdoors, etc., despite that he has been given literature demonstrating that outdoor gatherings, tobacco, flames, etc. are essential for Organic Asatru members (Godians at EJSP) to practice their rites.  Defendant Akins won't help get Plaintiffs approved and won't properly represent Plaintiffs' needs to the administration, RIC, and others above him.

141.    Defendant Akins has some of his followers and his workers grow and maintain a collection of living plants that are constantly being interchanged to enhance the religious experience for other groups, but will not allow Plaintiffs to have living plants during their rites, despite that he has been given literature demonstrating that living plants are essential for Organic Asatru members (Godians at EJSP) to incorporate living plants in their rites.

142.    Defendant Akins retaliated against Plaintiffs by having some of them moved, keeping some of them off lists, and contributing to having at least one member shipped out

of the prison after having threatened to do so if the grievance system and other complaints continued to be submitted, or if Plaintiffs sought relief from the courts.

143.     Defendant Akins withheld and misappropriated funds that were supposed to be divided amongst all religious groups.   Plaintiffs were never given any portion of the funding, despite that they continued to submit lists of books and other items that Defendant Akins claimed he would arrange to be ordered from the funding.

144.     Defendant Akins would not ensure that the pass list and faith-declaration forms separate Plaintiffs from Wiccans and distinguish between Asatru, Odinism, and Wicca, forcing some Plaintiffs to forfeit attending gatherings due to their unwillingness to declare themselves as something contrary to their beliefs, be called something contrary to their beliefs, and/or be associated with something contrary to their beliefs, and forcing other Plaintiffs to declare themselves something that is contrary to their belief, be called something contrary to their beliefs, and be associated with something contrary to their beliefs in order to attend gatherings.

145.     Defendant Akins would not ensure that Plaintiffs are given equal positions as clerks and set-up members, as is done for other groups.

146.     Defendant Akins will not allow Plaintiffs to have an altar for their group, but allows Christians to have a podium/ altar that has distinctively Christian symbols and wording.

147.     Defendant Akins will not intervene to explain to the administration and the Religious Issues Committee that it is necessary for Plaintiffs to prepare their own ritual and ceremonial foods, so that they can ritually charge the foods and ensure that essential purification rites have been performed in order to have the food rendered fit for the transubstantiation process conducted within the actual holy day rites.

148.    Defendant Akins will not help ensure that Plaintiffs are able to have polytheistic offerings for their deities, rather than being forced to conform to only one type of offering for one deity, when all members of the Asatru family represented by Plaintiffs have a minimum of over fifty deities who must be given specific offerings. Plaintiffs sincerely believe they must provide their deities with their corresponding offerings to avoid offending and/or failing to appease their deities.

149.    Defendant Akins will not assist Plaintiffs in gaining permission to order and use items that are essential to the ways in which Plaintiffs sincerely believe they must practice their religion, including but not limited to having ritual and ceremonial items, corresponding offerings and materials for making corresponding offerings, having dream pillows and meditation mats large enough to perform rune yoga, and having the ability to order and take DNA tests to ascertain each individual's personal spiritual heritage, which Plaintiffs must do in order to practice their religion properly.

150.    Defendant Akins has failed to provide plaintiffs with equal storage space for their items and equal literature displays.

151.    Defendant Akins will not help ensure that Plaintiffs are given equal funding and services.

152.    Defendant Akins will not ensure that Plaintiffs' religious gatherings and events are posted throughout the prison and through the prison's video bulletin, as he ensures is done for other groups.

153.    Defendant Akins will not ensure that Plaintiffs have a gathering environment that is free from symbols, sights, smells, and sounds that are associated with the destruction and hatred of Plaintiffs' religion and its followers. Monotheistic books, symbols, words,

music, prayers, and other offensive distractions are constantly present when Plaintiffs

gather, and they are forced to endure these symbols of hatred for their religion and signs of

the destruction of their religion and its followers.

154.   Defendant Akins will not help ensure that Plaintiffs are able to shower before their

gatherings, as is done for other groups.

155.   Defendant Akins will not ensure that plaintiffs have tables for eating during the

holy day gatherings; instead, they are given only one table to hold the trays of food, and

have no place to eat.

156.   Defendant Akins will not help ensure that Plaintiffs are given equal treatment

during feast gatherings, as is done for banquets for other groups.   There are no serving

utensils, no ability to have photographs taken, insufficient seating, no table cloths, no

ability to invite guests, no ability to order items and have them delivered for the banquet,

such as Muslims and Christians being allowed to order sodas from commissary and items

such as dates and other religious foods from street sources. or any of the other treatment

provided to other groups.

157.   Defendant Akins will not provide religious counseling to Plaintiffs. despite that it is

in his job duties. so Plaintiffs at EJSP must go without any form of spiritual or other

religious counseling while other groups are given counseling.

158.   Defendant Akins has claimed that more time, funds, items. services, and

opportunities are required for mainstream groups because there are more members, but it

stands to reason that there are more mainstream members because they are given more

time, funds, items services, and opportunities.   Defendant Akins bragged to some

Plaintiffs about having raised the numbers of his followers at EJSP through more callouts and utilizing the funds and services for his benefit. Akins showed preferential treatment to his religion above others, and then to monotheism and established religions above Plaintiffs' religion.

159. Defendant Akins has deprived Plaintiffs in "lock up" of equal access to religious literature, whereas members of mainstream and established religions are given reading literature whenever they go to any areas of the prison outside of general population. In 2018 and 2019, Defendant Akins was given literature for the following Plaintiffs whom Akins refused to ensure were able to have religious literature while out of general population: Patriaco, Castalluzzo, Atwell, DeHaven, Chapman, Digisoffatte, Smith, and others. Defendant Akins also retaliated against Plaintiffs by having their passes not be issued, having their gatherings held in the IGC where it was known that they would be regularly canceled, having non-religious groups gather instead of Plaintiffs' groups during Plaintiffs time and space without even notifying Plaintiffs first, and ignoring long-term cancellations and missing food for Plaintiffs' Holy Day gatherings.

## Count Nine

DEFENDANT BRANTLEY ACTED IN HIS OFFICIAL AND INDIVIDUAL CAPACITY, UNDER COLOR OF STATE LAW, AND IN MOST INSTANCES WITH MALICIOUS INTENT, TO DEPRIVE PLAINTIFFS AT NSP OF THEIR CIVIL RIGHTS.

160. Defendant Brantley deprived Plaintiffs of gathering on approved precise solar events and for 27 other approved holy days, and would not assist in local approval of holy days.

161.     In August of 2019, Defendant Brantley was asked to begin allowing plaintiffs at NSP to observe the other approved holy days, aside from the four high holy days, but he refused to do so.   On November 10, 2019, Defendant Brantley was asked to come into compliance with 10A:17-5.11(a), which provides that "Religious holidays of recognized faith groups shall be acknowledged," but he merely stated that the request would "be taken into consideration."   He subsequently denied plaintiffs the ability to observe the other approved holy days at NSP.

162.     Defendant Brantley has also deprived Asatru members in his prison of having equal callouts and gathering times, equal access to musical equipment, equal ability to have the foods, drinks, items, and accommodations necessary to perform their rites, equal ability to prepare their own foods and have foods and drinks that are religiously appropriate, and the ability to otherwise enjoy equal treatment as listed under this count and elsewhere in this complaint.

163.     For several months since August of 2019, Defendant Brantley allowed plaintiffs to gather only one day a week, and forced them to sit in a tightly confined closet space along with Wiccans who have conflicting beliefs and contribute conflicting and offensive language to the gatherings.   During this time, Plaintiffs were not allowed to use any musical instruments, make any loud sounds, have any study days, have any ritual or ceremonial items, or have any of the approved foods and drinks to perform their rites.   In contrast, they were forced to gather in the storage closet that lacks room for all of the members on Plaintiffs list, while they listened to the inculcating sounds   of Christian groups in the large gathering area sing, use musical instruments, pray, and use loud anti-polytheistic language that is offensive to Plaintiffs, whose religion and its followers

were systematically killed and/or forced to accept the very religion Plaintiffs had to hear

being celebrated while Plaintiffs were stifled and surrounded by Christian literature and

symbols

164.      In addition, Defendant Brantley has told plaintiffs at NSP that they are not allowed

to chant, sing, or play musical instruments on their worship-service day or during their holy

day gatherings, whereas other groups are allowed to perform such religious music during

their worship service days and holiday gatherings.   The reason for not allowing Plaintiffs

to make noise on their worship-service day is that there is a conflict between Plaintiffs

needing to chant, sing, and play music for their rites, and the Buddhists (who are also in the

chapel area at that time) needing to have silence for their meditative rites.   The conflict

was resolved in favor of the Buddhists, rather than having the two groups rescheduled to

end the conflict, or having them alternate so some of the time is spent allowing each group

to practice their rites.   Moreover, Plaintiffs have to hear the Buddhists ringing bells and

making other sounds, and Plaintiffs have to hear Christians and Muslims make sounds

during Plaintiffs gathering times.   The Buddhists, Christians, and Muslims are not

required to alter their rites in favor of plaintiffs.

165.      In January of 2020, Defendant Brantley finally began allowing some of the

members on Plaintiffs' list to gather for a study day in the small closet area that lacks room

for all of the people on Plaintiffs' list.   However, it took several weeks and intervention

from the administration before Defendant Brantley began to allow Plaintiffs to make any

sounds during their gatherings.   At first, they were limited to using only one guitar and

two bongo drums.   After additional intervention from the administration, Plaintiffs were

told by Defendant Brantley that they could begin using all of the musical equipment, but

they were still placed in a small area where they could not fit all of the equipment, and they then had to ask additional members to stop coming in order for there to be room for a small portion of the musical equipment to be used by an even smaller amount of the people on Plaintiffs' list.

166.    Other groups at NSP are also allowed to have at least one day for practicing their music, as well as at least one day for studying, but Plaintiffs are not given any time to practice or study, and are not allowed to perform their musical offerings during their worship day.

167.    Members of other religions are allowed to have their musical instruments, religious foods and drinks, prayer rugs, and other such items in their cells at NSP, but Plaintiffs are not allowed to have similar items that fit the requirements of Organic Asatru, and Defendant Brantley will not intervene.

168.    Defendant Brantley has scheduled some prisoners to gather six days a week, and twice a day for three of those days, but will not allow Plaintiffs to gather for their daily rites.

169.    Defendant Brantley would not contact volunteers or reach out to find information and volunteers for Asatru groups at the prison, despite having been given several names and information.

170.    Defendant Brantley would not obtain, download, or print out free Asatru literature for plaintiffs, despite having been given plenty of information and requests to do so.

171.    Defendant Brantley was instructed by the administration to accommodate Plaintiffs with equal treatment, but did not do so.

172.     Defendant Brantley will not allow Plaintiffs to have an altar for their group, but allows Christians to have a podium/ altar that has distinctively Christian symbols and wording.

173.     Defendant Brantley will not intervene to explain to the administration and the Religious Issues Committee that it is necessary for Plaintiffs to prepare their own ritual and ceremonial foods, so that they can ritually charge the foods and ensure that essential purification rites have been performed in order to have the food rendered fit for the transubstantiation process conducted within the actual holy day rites.

174.     Defendant Brantley will not help ensure that Plaintiffs are able to have polytheistic offerings for their deities, rather than being forced to conform to only one type of offering for one deity, when all members of the Asatru family represented by Plaintiffs have a minimum of over fifty deities who must be given specific offerings. Plaintiffs sincerely believe they must provide their deities with their corresponding offerings to avoid offending and/or failing to appease their deities.

175.     Defendant Brantley will not assist Plaintiffs in gaining permission to order and use items that are essential to the ways in which Plaintiffs sincerely believe they must practice their religion, including but not limited to having ritual and ceremonial items, corresponding offerings and materials for making corresponding offerings, having dream pillows and meditation mats large to perform rune yoga, and having the ability to order and take DNA tests to ascertain each individual's personal spiritual heritage, which Plaintiffs must do in order to practice their religion properly.

176.     Defendant Brantley has failed to provide plaintiffs with equal storage space for their items and equal literature displays.

177.     Defendant Brantley will not help ensure that Plaintiffs are given equal funding and services.

178.     Defendant Brantley will not ensure that Plaintiffs religious gatherings and events are posted throughout the prison and through the prison's video bulletin, as he ensures is done for other groups.

179.     Defendant Brantley will not ensure that Plaintiffs have a gathering environment that is free from symbols, sights, smells, and sounds that are associated with the destruction and hatred of Plaintiffs' religion and its followers. Monotheistic books, symbols, words, music, prayers, and other offensive distractions are constantly present when Plaintiffs gather, and they are forced to endure these symbols of hatred for their religion and signs of the destruction of their religion and its followers.

180.     Defendant Brantley will not ensure that Plaintiffs have enough room to gather for their regularly scheduled callouts or for their holy day gatherings. Instead, they are packed into a small closet area without enough room for all of the members to fit. The room is in the shape of a triangle that is approximately sixteen feet on the longest wall and ten feet on the shortest wall, with shelves and cabinets sticking out two to three feet on all of the walls, leaving room for no more than nine people to sit shoulder to shoulder. There is insignificant air ventilation in the room for that many people, and the gatherings have been uncomfortable, with many members being asked to avoid coming in order to have room for everyone to fit, and many other members to not come on their own due to frustration with the uncomfortable conditions. It is also a fire-code violation for that many people to be in the small area.

181. Defendant Brantley will not ensure Plaintiffs are given equal rights to shower before their gatherings.

182. Defendant Brantley will not ensure Plaintiff are given ritual trays during lock downs (as happened on March 19, 2020), or given access to feast trays and instruments in ad seg.

183. Defendant Brantley will not transport an instrument from property to the chapel where it is approved for Plaintiffs to use, and will not let Plaintiffs order religious instruments.

184. Defendant Brantley will not ensure Plaintiffs are given equal treatment during feast gatherings. They are not given serving utensils, the ability to have photographs taken, the ability to invite guests, or access to tables at which to eat.

185. Defendant Brantley will not ensure the pass list and faith-declaration forms separate Plaintiffs from Wiccans and distinguish between Asatru, Odinism, and Wicca, forcing Plaintiffs to either forfeit attending gatherings or compromise their beliefs due to their unwillingness or compulsion to declare themselves as something contrary to their beliefs, be called something contrary to their beliefs, and/or be associated with something contrary to their beliefs.

186. Defendant Brantley will not ensure Plaintiffs are given equal positions as clerks and set-up members. Plaintiffs are not called down early to set up musical equipment for practice time, cutting their practice time down to less time in their single weekly use of instruments, in addition to having only one day a week to use musical equipment in an area that doesn't fit all members or all equipment. It's a four-part inequality.

66

## Count Ten

DEFENDANT JOHN DOE CONSPIRED TO RETALIATE AGAINST AT LEAST ONE PLAINTIFF BY HAVING HIM TRANSFERRED FROM EAST JERSEY STATE PRISON TO NORTHERN STATE PRISON IN AUGUST OF 2019, AFTER SEVERAL PLAINTIFFS WERE WARNED THAT SUCH RETALIATION WOULD TAKE PLACE IF THEY CONTINUED TO FILE GRIEVANCES OR SEEK RELIEF FROM THE COURT, WHICH THEY DID.

187.     Sometime in August of 2019, the Plaintiff Number One, the plaintiff who filed the most grievances and other complaints, and the plaintiff responsible for creating and filing legal documents and having several DOC defendants served by the U.S. Marshalls Service, was shipped out at the direction of Defendant John Doe based on retaliation for Plaintiff Number One engaging in the aforementioned protected actions.

## Count Eleven

DEFENDANT JANE DOE DISCRIMINATED AGAINST 8 PLAINTIFFS BY HAVING THEM MOVED AT NORTHERN STATE PRISON BASED ON THEIR RELIGIOUS BELIEFS.

188.     Sometime during the Fall of 2019, there were ten Asatru members on B-1-East at Northern State Prison, and 8 of them were moved off the tier based on their religious beliefs.   No other prisoners were moved off the tier that day.   The impact was that some

of those members and some other Asatru members decided to stop going to Asatru services, and others decided not to join. The religion was given a bad reputation, and other prisoners, staff members, and officers all looked down on Asatru after that, with comments being made that made it clear they now believed members of the group belonged to some type of negative belief system.

## Count Twelve

PLAINTIFFS WITHIN THE DOC HAVE BEEN SUBJECTED TO ADDITIONAL MISCELANEOUS VIOLATIONS OF THEIR RIGHTS.

189.    Defendants Akins, Brantley, and Wilcox deprived new prisoners and prisoners in lock up of equal access to religious literature and items. These two defendants ensure that members of mainstream groups are given literature and medallions as soon as they come into the building and as soon as they get locked up. Permission is not needed for Rosary beads to be provided to prisoners of that faith, and there is a stash of readily available rosary beads that are given to Catholics whenever they reach the prison or are moved to a pre-hearing detention or segregation cell. This allows members of that faith to be given religious medallions faster and without cost at all times. This is disparate treatment, and Plaintiffs have been deprived of the equal ability to have Thor's hammers, runes, and other such religious items readily available. In many cases, they can't have the items at all; in other cases, they can have only items that conform to the type for monotheists.

190.     Defendants Akins, Brantley, Wilcox refused to consider, approved,  or even acknowledge Plaintiffs' requests to practice the Organic Asatru version of their beliefs, as described in the attached requests and appendices.

191.     Defendants Lee, Ricci, D'Ilio, and Hicks refused to consider or acknowledge Plaintiffs appeals from the lack of consideration, approval and/or acknowledgement of Plaintiffs' requests to practice the Organic Asatru version of their beliefs, as described in the attached requests and appendices.

192.     Plaintiffs in most prisons within the DOC are deprived of the ability to purchase safe toothbrushes and flossing materials or have access to them.   Oral hygiene is a mandatory part of Plaintiffs' sincerely held beliefs, as they believe their god Thor died from smelling the foul breath of the World Serpent, and they believe bad breath impedes their ability to reach full states of meditation.   In only one prison within the DOC, the state provides only one toothbrush that is manufactured for the purpose of being used more than one time.   It is a soft-bristled security brush that is flexible and has a short handle.   It is given out to prisoners when they first enter into Bayside State Prison ("Bayside").   This toothbrush is not sold anywhere and is not provided anywhere else in the prison system.   With the exception of NSP, the only toothbrush sold and provided to incarcerated Plaintiffs is the same size as the one provided at Bayside, but it is meant for only one use, it has dangerously hard bristles, it becomes rusty within a few uses from metal pieces securing the bristles, and it is dangerous even on the first use because it scrapes gums due to the stiff bristles.   After more than one use, its bristles become splayed and they cut into the gums. The handle is not flexible, and the company that makes the toothbrush has stated that it is not made for more than one use.   Nevertheless, all prisons other than Bayside State Prison

provide the dangerous version upon entry, and the only toothbrush for sale throughout every prison except NSP in the DOC is the dangerous one. In most areas of the prisons, there is a limit as to how many toothbrushes can be ordered, and it limited to as little as two single-use toothbrushes per month in NJSP administrative segregation and ten per order in EJSP population. This allows for only a limited amount of times Plaintiffs can brush their teeth, and leaves Plaintiffs unable to brush their teeth anywhere near as often as recommended by the American Dental Association ("ADA").

193.     The ADA recommends flossing at least once a day, but this is either not possible in some prisons or is excessively costly throughout the DOC. In NJSP, no form of floss is sold or provided. In NSP and EJSP, ineffective dental loops are sold at costly prices. Defendants Ricci, D'Ilio, and Hicks are deliberately indifferent to this problem.

194.     Defendant Rutgers provides dental cleanings only once every two years. and it fails to provide safe dental hygiene products and procedures that are in agreement with Plaintiffs' beliefs. The ADA states that cleanings should be done every six months. The short-term impact is bad enough, but the long-term impact for Plaintiffs serving several years behind bars has resulted in permanent damage to many Plaintiffs' teeth and gums.

## Count Thirteen

DEFENDANT JPAY HAS DEPRIVED PLAINTIFFS OF THEIR RITES IN
NUMEROUS WAYS.

195.     Defendant JPAY provides exploding batteries and other dangerous conditions in the DOC, and has participated in bait-and-switch tactics to deceive Plaintiffs in the DOC.

70

JPAY has installed kiosks throughout the prison system, but not enough kiosks for sufficient use, and not enough staff members to keep the kiosks working. Plaintiffs are limited to only one 20-minute session each time they are granted the ability to use the kiosk, which Plaintiffs must use in order to access the DOC grievance system, check their e-mails, check their prison accounts, sign up for programs, submit sick-call requests and other medical requests, access the news stand, order and download music and books, and enter JPAY trouble tickets.

196.     Most Plaintiffs are limited to only one or two 20-minute kiosk sessions per week, and sometimes less than that. Plaintiffs often have to forfeit recreation, mess movements, and religious study groups or other such passes in order to access the kiosk system, which further interferes with grievances, etc.

197.     Defendant JPAY's Kiosk program allows access to DOC grievance system. Plaintiffs often have problems using the grievance system because the kiosks are frozen or otherwise not in working order. When the kiosks are in working order, the system often fails to record what was typed, and instead provides a notice explaining that the grievance filing was not entered into the system. The kiosks often freeze for several minutes in each session leaving only a very small amount of time to use the grievance system.

198.     Plaintiffs must choose to access the grievance system or check their e-mails, check their prison accounts, sign up for programs, submit sick-call requests and other medical requests, access the news stand, games, and card orders, order and download music and books, enter JPAY trouble tickets, and so forth.

199.     Even if Plaintiffs were to forego using the other options on the kiosk and devote their short 20-minute sessions exclusively to accessing the grievance system, some of this

71

time must be spent reading the previous responses from prior submissions, so the time is limited. Moreover, in many cases, the grievance system cannot be accessed on the kiosk, and only mail media options are available for several days to several weeks in some cases.

200.   Defendant JPAY entered into a contract with Defendant New Jersey to, in part, provide a digital grievance system that Plaintiffs are able to use through kiosks that are stationed around the prisons. After the system was put into place, the administrations at NJSP, NSP, and EJSP phased out the distribution and responses to hard copies of inquiries, grievances, appeals, and medical slips, and restricted almost all of their responses to the entries that are submitted on the kiosks.

201.   In many instances, especially in ad seg, hard copies of the inquiry, grievance, appeal, and medical slips are not even handed out by staff members.

202.   Consequently, the grievance and medical systems are limited as a result of there not being enough kiosk machines, the machines often being down, Plaintiffs being provided insufficient time to use the kiosks, Plaintiffs being dissuaded from using the kiosk for only grievance and medical issues, staff members failing to hand out and answer hard copies of grievance and medical forms, and the administrative and downtown DOC defendants being deliberately indifferent to these issues.

203.   Defendant JPAY advertised a JP5 player ("tablet") to Plaintiffs. The advertisement claimed the tablet would come with a power cord and would offer an FM-stereo function. After Plaintiffs had purchased the tablets, they realized there was no power cord and there was no reception on the FM-stereo function. Consequently, the only way for Plaintiffs to use the tablet is to pay for batteries and purchase music, etc. Plaintiffs are limited to only a certain amount of batteries they can purchase, so they are

limited as to how often they can use this product after the bait-and-switch sales tactics had been achieved.

204.    The only batteries provided by Defendant JPAY and sold in the DOC are non-rechargeable, and these batteries state on their sides on the packages that they will explode if they are charged.   The kiosks charge the batteries when the tablets are hooked up for downloading, and Plaintiffs must download frequently in order to prevent the tablets from shutting down.   As a result, the batteries often rupture and leak battery juices into the tablets, causing them to stop working.   Additionally, if new batteries are in the tablets when they are hooked up to the kiosks, the power from the batteries and from the charge the kiosks provide combine to equal too much power for the tablets, which results in the tablets being overloaded and not working.

205.    Defendant JPAY has a warrantee for their tablet and 2-week warrantee for their headphones that cannot be read until after the product has been purchased, and there is no notice of how to operate the tablet or access the warrantee information.

206.    It takes several weeks and sometimes months for JPAY to approve replacing tablets and sending them when it is within the warrantee period.   During long periods when Plaintiffs have been without their tablets, they have not been able to access the music and other options they paid for, and they must use their short 20-minute kiosk sessions to read their e-mails, address the JPAY trouble-ticket issues, and otherwise not have time to access the grievance and medical systems on the kiosks.

207.    Some Plaintiffs have had several tablets explode and have gone several months without tablets while waiting to get replacements and/or waiting to afford to purchase new tablets when Defendant JPAY claims the warrantees have run out.

208.     Defendant JPAY allows non-medical staff in the DOC system to access

confidential medical information, including mental-health information about Plaintiffs.

Count Fourteen

THE UNITED STATES OF AMERICA HAS DEPRIVED PLAINTIFFS OF
THEIR RIGHTS.

209.     Defendant The United States Government has allowed such groups as the Native

American Church, which has been a legal non-profit organization since 1918, to have

religious exemption from such things as being able to perform rituals and ceremonies with

peyote, but they will not do so for Plaintiffs who sincerely believe they must perform rites

that involve creating, possessing, sharing, and absorbing cannabis, mushrooms,

moonshine, and other Soma.   Classifying cannabis as a schedule-one drug and failing to

reclassify after newly discovered evidence has proven its harmlessness burdens Plaintiffs.

Count Fifteen

DEFENDANT WILCOX HAS REFUSED TO PROVIDE PLAINTIFFS AT NJSP WITH
WHAT IS APPROVED FOR ASATRU, WITH WHAT IS NEEDED FOR ASATRU,
AND WHAT IS EQUAL FOR ASATRU.

210.     At NJSP, Defendant Wilcox is the Chaplain of Religious Services, and he is a

member of the Religious Issues Committee.   He has either directly or indirectly deprived

Plaintiffs of practicing their religion as it is approved, as it is required to be practiced, and

with equal accommodations as those provided to other religious groups at NJSP.  He has also been deliberately indifferent to issues that he could otherwise alter.

211.     Defendant Wilcox has lied about issues related to Plaintiffs' religion in order to avoid granting Plaintiffs at NJSP any form of religious rights and equal rights, and to avoid being scrutinized for having never met with Plaintiffs after having claimed that he had done so, would do so, or would and had directed others to do so.

212.     Defendant Wilcox claimed that he had personally known of documents that had been sent to the Religious Issues Committee ("RIC") for requests that the IMP be followed and expanded, and that additional considerations be approved to allow Plaintiffs at NJSP to practice their religion without burdens and with equality.  Defendant Wilcox either did not ensure that the RIC addressed the matters, or the other defendants of the RIC listed in this complaint were deliberately indifferent.

213.     Defendant Wilcox has also deprived Plaintiffs at NJSP of their rights in the ways listed elsewhere in this Complaint.

214.     Due to a lack of action on part of Defendant Wilcox, Plaintiffs at NJSP are not given any of the items or offerings permitted in the IMP for Asatru, they are not given all of the approved holy days, they are not given equal time for outdoor services, equal callouts, or equal access to musical instruments and practice times, and they are not given any of the items they have requested permission to order and retain, including but not limited to the items listed elsewhere in this complaint.  The only items he appears to have listed in the numerous requests submitted to him are natural soap, which he appears to have turned over to Defendant Hicks after many months of delays, but only after ignoring several other

requests and several additional items in 2016 and 2017, as described in the attached

documents

### Count Sixteen

THE TOP BUNKS AND MATTRESSES IN THE DOC FORCE PLAINTIFFS TO DEFY THEIR RELIGIOUS BELIEFS; THE MATTRESSES ARE NOT REPLACED OFTEN ENOUGH, AND THE BUNKS ARE TOO HIGH, UNSAFE, AND NOT EQUIPPED WITH ANY SAFE PLACES TO HOLD OR STEP ON THE WAY UP AND DOWN, AND DEFENDANTS JANE DOE, LEE, RICCI, D'LLIO, AND HICKS HAVE BEEN DELIBERATELY INDIFFERENT TO THESE ISSUES.

215.     Defendants Jane Doe, Lee, Ricci, D'Ilio, and Hicks were made aware of the

numerous problems with the mattresses and top bunks in the DOC, but they were

deliberately indifferent.

216.     The mattresses wear out quickly and are not replaced until long after they have

worn out and caused lack of sleep and pain, as well as lack of Plaintiffs' ability to perform

dream rites.

217.     Plaintiffs have no place to step or hold while getting up and down, and several

Plaintiffs have fallen off top bunks and been injured.

218.     The bunks are also too high for Plaintiffs who practice the elevated meditation rites

of Organic Asatru, which require sleep to take place lower than the height of the ritual high

chair in Plaintiffs' historical rites.

### Relief Sought

219.     Plaintiffs seek relief in the form of a preliminary injunction ordering Defendants to

grant Plaintiffs in the DOC equal time and space for outdoor services and indoor functions.

220. Plaintiffs within the DOC seek preliminary injunctions ordering that Plaintiffs can create, publish, and profit from religious literature and art, have privacy for the stated basic human functions, and have safe daily exercise.

221. Plaintiffs in the DOC seek relief in the form of a preliminary injunction ordering Defendants to allow Plaintiffs in the DOC to temporarily order and pay for their own organic foods, and pure spring water pending a ruling as to whether said items must be provided by the state.

222. Plaintiffs seek relief in the form of a preliminary injunction ordering Defendants to allow Plaintiffs in the DOC to order and retain organic/natural soap and detergent.

223. Plaintiffs seek relief in the form of a preliminary injunction ordering Defendants to allow Plaintiffs in the DOC to order and retain meditation mats, cushions and dream pillows.

224. Plaintiffs seek relief in the form of a preliminary injunction ordering Defendants to allow Plaintiffs in the DOC to order and retain the items listed herein and in the attachments, and have the means necessary for Plaintiffs to perform ritual purification and their other rites as described in the attached appendix.

225. Plaintiffs seek relief in the form of a preliminary injunction ordering Defendants to allow Plaintiffs in the DOC to either be placed in single cells or to have options to choose cellmates who practice the same ritual purification and hygiene laws and don't display crosses and other hate symbols or sing any anti-polytheistic religious songs that interfere with Plaintiffs' abilities to read religious literature and meditate in peace and live in their beliefs' form of a metaphysically clean living area.

226.     Plaintiffs seek an injunction and/or Temporary Restraining Order to prevent any of the defendants from charging, incarcerating, or otherwise punishing Plaintiffs for performing any of their religious rites, including saving and sprouting seeds, saving apple stems and sprouts, and otherwise performing their rituals as described in this complaint and the attached declaration and appendix in so far as no legitimate governmental interests are ignored, but the least-restrictive means of securing compelling governmental interests are employed.   Plaintiffs in EJSP seek renewal of Godian-Asatru gatherings.

227.     Plaintiffs on parole and probation or will soon be on parole and probation who are subjected to violating the conditions of parole and probation and consequently entering or returning to the DOC/programs seek an injunctive order that allows them to practice their religion as described in this complaint and the attached declaration and appendix without the fear of being fined, imprisoned, and otherwise significantly burdened.

228.     Incarcerated Plaintiffs seek a Temporary Restraining Order preventing Defendants from shipping any of the Plaintiffs out or moving them for illegitimate purposes again.

229.     Plaintiffs in and out of the DOC seek injunctions and declaratory relief that allows them to practice their religion as described in this complaint and their submitted literature.

230.     Godian Plaintiffs additionally seek declaratory relief in the form of an order stating that their version of Asatru must be treated with equal protection of the laws.

231.     Plaintiffs seek relief in the form of injunctive orders compelling New Jersey and the United States of American and their representative defendants to turn over all documentation related to religious exemption and other grounds for being permitted to practice Plaintiffs' religion without facing fines, imprisonment, or other such punishments.

78

232. Plaintiffs seek prospective relief for future Organic Believers in the DOC who will be exposed to the aforementioned conditions and significant burdens in administrative segregation and population.

233. Plaintiffs seek relief for Organic Believers in society or soon to be in society who sincerely believe they must hunt, trap, and fish for specific rites, which requires them to have religious exemptions, including not paying money to hunt and fish ritual foods, and being allowed to possess ceremonial archery sets (bow and arrows).

234. Plaintiffs also seek all appropriate punitive damages, compensatory damages, nominal damages, and any other relief available, including but not limited to the following monetary relief.

235. Plaintiffs housed in the DOC from September 21, 2016 to present seek monetary damages in the amount of $50 a day for each Plaintiff who was deprived of equal services and other opportunities from religious services, study groups, banquet opportunities, access to musical equipment and practice time, ability to practice Godian Asatru, etc.

236. Plaintiffs housed in DOC from September 21, 2016 to present seek monetary damages in the amount of $125 a day for each Plaintiff who was deprived of approved Holy Day ceremonies on the specific dates for each solstice and equinox, despite that the Internal Management Procedures allows for those precise dates, and denied Godianism.

237. Plaintiffs housed in the DOC from September 21, 2016 to present seek monetary damages in the amount of $50 a day for each Plaintiff who was deprived of equal treatment for sacred gatherings that took place precisely on the solstices and equinoxes for other groups, despite that the IMPs state that the holy day gatherings for Plaintiffs must take place on those dates, and despite that holy day and holiday events related to the solar and

lunar calendars take place on their precise dates for similarly situated prisoners who practice Christianity, Judaism, and Islam, and despite that federal holidays are held on the precise days. Plaintiffs additionally seek $50 a day for each of the other approved Holy Days for Asatru that were not allowed to be celebrated. Plaintiffs housed in NJSP, NSP, EJSP and SWSP from September 21, 2016 to present seek monetary damages in the amount of $50 a day for each day that Plaintiffs had their medallions seized, not approved, and/or not permitted to be worn in plain view when these practices and policies were not used for similarly situated prisoners.

238.    Plaintiffs housed in EJSP from September 21, 2016 to present seek monetary damages in the amount of $50 a day for each Plaintiff who was deprived of equal access to outdoor gatherings, fire, and sacred tobacco and other herbs and items. Plaintiffs incarcerated in the prisons from September 21, 2016 to present seek monetary damages in the amount of $50 a day for each Plaintiff who was deprived of equal access to outdoor gatherings, fire, and sacred tobacco and other herbs and items at NJSP, which were and are provided to the Native Americans.

239.    Incarcerated Plaintiffs seek Compensatory Relief in the form of 1) $125 to each plaintiff for each day that Plaintiffs Atwell, Lucas, Crow, Helm, Planker, Cassella, and others skipped lunch and yard movements because they had been told they were on the list to attend, but were not allowed to participate in the solstice and equinox gatherings at EJSP, and for each incarcerated plaintiff who did not get to celebrate the solstice and equinox on the exact solar dates from September of 2016 until present; 2) $125 to each EJSP Asatru member who was not allowed to perform the summer-solstice rune song offering that had been prepared for June 21, 2019; 3) $25 a day for each Plaintiff for each

day that Asatru services were not permitted and/or the items and offerings were not provided or allowed to be purchased for regularly scheduled worship services and all approved holy day rites at all for the prisons and camps; 4) funding in the amount equal to the funds that were used for other EJSP religious groups but were not used for Asatruar from September of 2016 until present; 5) $125 a day for each plaintiff for each day Asatru members in prehearing detention and administrative segregation in all prisons, and for specifically named plaintiffs at EJSP who were not provided with religious reading materials on the days in 2018 and 2019 when plaintiffs Castelluzo, Atweil, DeHaven, Patriaco, Smith, Chapman, and others were detained and Defendant Number Akins was given religious literature but refused to deliver it or have one of his workers deliver it; 6) $25 a day for each day from September of 2016 onward that the chapels in all the prisons displayed religious literature for mainstream groups but refused to display literature for Plaintiffs; 7) any additional compensatory damages that are deemed appropriate by a judge and/or a jury.

240.    Plaintiffs who have been incarcerated for more than 16 months and have suffered from the claims listed herein seek punitive and/or compensatory damages of $25,000 and an additional $1,500 per month leading up to a ruling, each for the aggregate of the treatment described.  Plaintiffs who have been incarcerated less than 16 months and have been impacted as described herein seek punitive and/or compensatory damages of $1,500 per month.

241.    Incarcerated Plaintiffs seek preliminary injunctions compelling Defendants Hicks, Akins, Brantley   and Wilcox to 1) allow Plaintiffs to participate in IMP-approved congregate services; 2) follow the IMP guidelines by allowing the dozens of

Godian-Asatru plaintiffs at EJSP to gather on Godian Holy Days that must take place on precise dates, and gather on the closest Saturdays to Godian Holy Days that do not have to take place on precise dates, and to have an outdoor worship area on natural ground with plants and natural seating, organic ingredients for making approved solid and liquid sacrifices, and equal time and space to practice and perform rune songs; 3) provide equal funding for members and clearly identify the amounts available; 4) allow members to order and retain/use ritual items/ingredients that are equal in comparison to other groups, including but not limited to meditation mats and sacred plants, herbs, incense, oils, and purification products, 5) allow Plaintiffs to order and retail sufficient spring water; 6) allow plaintiffs to order and retain safe and religiously acceptable oral hygiene products, soaps, and other essential items; 7) allow Plaintiffs to set up a group fund that allows them to donate and accept donations and then readily spend collective funds on essential items that go beyond what is covered; 8) issue a memo stating that Plaintiffs are allowed to perform group Rune Yoga outdoors on a daily basis in the same way Muslims are permitted to pray outdoors daily, and that Plaintiffs can bring soap to purify themselves in the showers outdoors; 9) all other matters in the attached Motion for Preliminary Injunctions.

242.    Plaintiffs seek injunctive relief in the form of an order compelling the state of New Jersey to allow Plaintiffs in the DOC and Plaintiffs on parole and probation to use medical marijuana. Plaintiffs also seek monetary awards for the time in which they were deprived of pain relief that is acceptable in their religion.

243.    Plaintiffs seek injunctive relief in the form of an order compelling Defendant the United State of America to remove marijuana from schedule-one classification.

82

244.     Plaintiffs within the DOC seek monetary damages in the amount of $125 a day for
each Plaintiff from Defendant Akins for each day from January of 2019 until present that
he did not give Plaintiffs at EJSP a religious service, equal callouts, and equal access to
musical equipment.

245.     Plaintiffs within the DOC seek monetary damages in the amount of $125 a day for
each Plaintiff from Defendant Brantley for each day from January of 2019 until present
that he did not give Plaintiffs at NSP a study group, equal callouts and equal access to
musical equipment.

246.     Plaintiffs seek an injunctive order that compels DOC defendants to create safe top
bunk steps and handles, and allows for Plaintiffs' beliefs to be honored.

247.     Plaintiffs within DOC seek an injunction compelling DOC Defendants to allow
Plaintiffs to create a non-profit organization with equal rights afforded to the other
inmate-run non-profit organizations within the DOC.

248.     Plaintiffs rely on the attached appendix to demonstrate how Organic Asatru has
been requested to be practiced within the State of New Jersey, the NJDOC, and the United
States of America and its territories.

## Certification of Plaintiffs

We hereby certify that the foregoing claims are not the product of any other case or controversy surrounding the facts of this case from September 21, 2016 until present.   We also certify that the foregoing statements made by us are true and correct.   We understand that we are subject to punishment if any of the foregoing statements are willfully sworn false.

Kevin Planker, Plaintiff Number One

Dated:   3 -/3 - 20

Ryan Pittinger, Plaintiff Number Two

Dated:   3/13/2020

84